# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

LARRY KLAYMAN, an individual
7050 W. Palmetto Park Road
Boca Raton, FL, 33433

                Plaintiff,

v.

DISTRICT OF COLUMBIA COURT OF
APPEALS
430 E St NW
Washington, DC 20001

     And

BOARD ON PROFESSIONAL
RESPONSIBILITY
901 4th Street, NW
Washington, D.C. 20001

     And

BUFFY MIMS
c/o 901 4th Street, NW
Washington, D.C. 20001

     And

ROBIN BELL
c/o 901 4th Street, NW
Washington, D.C. 20001

     And

CHRISTIAN WHITE
c/o 901 4th Street, NW
Washington, D.C. 20001

     And

BERNADETTE SARGEANT
901 4th Street, NW
Washington, D.C. 20001

     And

ROBERT WALKER
901 4th Street, NW
Washington, D.C. 20001

Case: 1:24-cv-02997 JURY DEMAND
Assigned To : Walton, Reggie B.
Assign. Date : 10/22/2024
Description: Pro Se General (Deck-F)

**COMPLAINT**

RECEIVED

OCT 2 2 2024

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

And

SARA BLUMENTHAL
901 4th Street, NW
Washington, D.C. 20001

And

MARGARET CASSIDY
901 4th Street, NW
Washington, D.C. 20001

And

THOMAS GILBERTSEN
901 4th Street, NW
Washington, D.C. 20001

And

WILLIAM HINDLE
901 4th Street, NW
Washington, D.C. 20001

And

SHARON RICE-HICKS
901 4th Street, NW
Washington, D.C. 20001

And

MICHAEL TIGAR
901 4th Street, NW
Washington, D.C. 20001

And

LESLIE SPIEGEL
901 4th Street, NW
Washington, D.C. 20001

Defendants.

## I.    INTRODUCTION

Plaintiff Larry Klayman ("Mr. Klayman") brings this action against the District of Columbia Court of Appeals ("DCCA"), the Board on Professional Responsibility ("Board"),

Bernadette Sargeant, Robert Walker, Sara Blumenthal, Margaret Cassidy, Thomas Gilbertsen, William Hindle, Sharon Rice-Hicks, Michael Tigar,  Leslie Spiegel (collectively the "Board Defendants"), Buffy Mims, Robin Bell, and Christian White (collectively the "AHHC Defendants")

## II.    JURISDICTION AND VENUE

1.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 as this actions arises under the United States Constitution and 42 U.S.C. § 1983.

2.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and the acts underlying this Court occurred in this district.

## III.    PARTIES

3.    Plaintiff Larry Klayman is an individual, a natural person. Mr. Klayman is at all relevant times a citizen and resident of the state of Florida.

4.    Defendant DCCA is the highest Court in the District of Columbia and is ultimately responsible for adjudicating attorney discipline matters.

5.    Defendant Board is appointed by Defendant DCCA and serves as its disciplinary arm, responsible for the adjudication of disciplinary cases and the administration of the attorney discipline system. The Ad Hoc Hearing Committee ("AHHC") preside over disciplinary hearings and are appointed by the Board.

6.    Defendant Mims is an individual, natural person. Defendant Mims was at all material times the chairperson of the AHHC in the disciplinary proceeding styled *In re Klayman*, 18-BD-070 (the "Bundy Matter") and is being sued in her individual and official capacities.

7.    Defendant Bell is an individual, natural person. Defendant Bell was at all material times a member of the AHHC in the Bundy Matter and is being sued in her individual and official capacities..

8.    Defendant White is an individual, natural person. Defendant White was at all material times a member of the AHHC in the Bundy Matter and is being sued in his individual and official capacities.

9.    Defendant Sargeant is an individual, natural person and at all material times, was a member of Defendant Board as its chairperson. She is being sued in her official capacity as a member of the Board and in her individual capacity.

10.    Defendant Walker is an individual, natural person and at all material times, was a member of Defendant Board. He is being sued in his official capacity as a member of the Board and in his individual capacity.

11.    Defendant Blumenthal is an individual, natural person and at all material times, was a member of Defendant Board. She is being sued in her official capacity as a member of the Board and in her individual capacity.

12.    Defendant Cassidy is an individual, natural person and at all material times, was a member of Defendant Board. She is being sued in her official capacity as a member of the Board and in her individual capacity.

13.    Defendant Gilbertsen is an individual, natural person and at all material times, was a member of Defendant Board. He is being sued in his official capacity as a member of the Board and in his individual capacity.

14.     Defendant Rice-Hicks is an individual, natural person and at all material times, was a member of Defendant Board. She is being sued in her official capacity as a member of the Board and in her individual capacity.

15.     Defendant Tigar is an individual, natural person and at all material times, was a member of Defendant Board. He is being sued in his official capacity as a member of the Board and in his individual capacity.

16.     Defendant Spiegel is an individual, natural person and at all material times, was a member of Defendant Board. She is being sued in her official capacity as a member of the Board and in her individual capacity.

17.     Defendant Hindle is an individual, natural person and at all material times, was a member of Defendant Board. He is being sued in his official capacity as a member of the Board and in his individual capacity.

## IV.    STANDING AND DAMAGES

18.     Mr. Klayman has standing to bring this action because he has been directly affected by the unlawful conduct complained herein. His injuries are proximately related to the conduct of Defendants.

19.     The Board Defendants have refused to apply Board on Professional Responsibility Rule 12.2 ("Rules 12.2") - which rule was promulgated by the Defendant DCCA and assigned to Defendant Board to enforce – to dismiss an ongoing disciplinary action against Mr. Klayman (the "Bundy Matter"). This is despite the fact that Rule 12.2 has been unequivocally and egregiously violated by the AHHC Defendants, who withheld their Report and Recommendation for **over four (4) years**, well past the required 120 days. Because the Board refused to enforce Rule 12.2, Mr. Klayman was forced to sue the Board to seek injunctive

relief in the form of an order requiring that Rule 12.2 be enforced (the "Bundy Litigation"), which would moot out the entire disciplinary proceeding. Mr. Klayman asked Defendant DCCA to either dismiss the disciplinary action on the basis of Rule 12.2 or to stay this disciplinary proceeding pending the outcome of the Bundy Litigation, but Defendant DCCA refused to do so, which necessitated this instant litigation. To make matters worse, the Board Defendants precipitously issued a Report and Recommendation while the Bundy Litigation was still pending, therefore creating the potential for a "temporary suspension" condition for Mr. Klayman, which in and of itself will cause him, his colleagues, his clients, and his family irreparable harm. And, even more, Office of Disciplinary Counsel ("ODC") is illegally sending out *ex parte* copies of the Board's non-binding Report and Recommendation to foreign jurisdictions and courts where Mr. Klayman is licensed to practice for the sole purpose of vindictively harming and tortiously interfering with Mr. Klayman and his clients and colleagues, giving rise to *Klayman v. Porter et al*, 2024-CAB-005220 (D.C. Sup. Ct.). In sum, the persons and entities of D.C. Attorney Discipline Apparatus as alleged herein are working together closely in concert to try to inflict as much harm as possible on Mr. Klayman to try to have him removed from the practice of law because he is a prominent conservative and Republican activist and attorney who they desire to silence contrary to his First Amendment rights. This is set forth in detail herein.

## V.    FACTS

### *Background Facts*

20.    Mr. Klayman is a prominent conservative and Republican activist and attorney who engages in public speech furthering his conservative and Republican activist views and associates with other conservative and Republican activists and attorneys. Mr. Klayman brings in the public interest lawsuits furthering conservative and Republican ideals and engages in public

speech through his weekly radio show and other fora furthering his conservative and Republican ideals. Mr. Klayman's biography is attached hereto as <u>Exhibit A</u>.

21.     In or around 2017, Mr. Klayman was retained by Cliven Bundy ("Mr. Bundy") to represent him in his criminal trial in the U.S. District Court for the District of Nevada ("Nevada Court") stemming from a 2016 standoff with federal agents on Mr. Bundy's land (the "Bundy Trial"). The stakes of the Bundy Trial were extremely high, as Mr. Bundy was facing the possibility of life imprisonment.

22.     Presiding over the Bundy Trial was the Honorable Gloria Navarro ("Judge Navarro").

23.     Because Mr. Klayman was not a member of the Nevada Bar, he moved for admission *pro hac vice* in the Bundy Trial. Judge Navarro denied Mr. Klayman's motion, and Mr. Klayman appealed that decision to the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit").

24.     Ultimately, there were multiple appeals and motions filed by Mr. Klayman to try to gain entry as counsel into the Bundy Trial due to the fact that Mr. Klayman was trying to zealously represent his client, Mr. Bundy. Mr. Klayman and Mr. Bundy saw that there was an enormous amount of prosecutorial misconduct going on in the Bundy Trial, which caused Mr. Klayman to push even harder to get into the case in order to zealously defend Mr. Bundy's rights within the bounds of ethics and the law.

25.     Mr. Klayman and Mr. Bundy's suspicions were more than confirmed when ultimately in January of 2018, Judge Navarro dismissed the charges against Mr. Bundy with prejudice as a result of gross prosecutorial misconduct in failing to turn over exculpatory

documents and lying to the Court. Mr. Klayman never was able to gain admission into the Bundy Trial.

26.     Despite Mr. Klayman having never been sanctioned by the Nevada Court or the Ninth Circuit for his efforts to gain admission into the Bundy Trial, ODC still initiated a disciplinary complaint against Mr. Klayman for simply trying to represent his client in a life-or-death criminal trial, alleging among other entirely frivolous and manufactured, contrived allegations, that Mr. Klayman had been dishonest and that his repeated attempts to gain *pro hac vice* admission into the Bundy Trial were somehow unethical.

27.     This was despite the fact that the Honorable Ronald Gould ("Judge Gould") of the Ninth Circuit, who was a part of the panel overseeing the appeals at issue, made factual findings that Mr. Klayman had fulfilled his duty of candor:

> Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate…. I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, **and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests.** *In re: Cliven D. Bundy*, 16-72275 (9th Cir. Oct. 28, 2016).

28.     The language of Judge Gould's portion of the opinion is irrefutably clear. *First*, Mr. Klayman submitted "a compliant response to the questions in the pro hac vice application." *Second*, Mr. Klayman "had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests."

### *Facts Pertaining to Disparate First Amendment Viewpoint Discrimination*

29.     The fact that ODC chose to prosecute Mr. Klayman for his attempts to gain *pro hac vice* entry in the Bundy Trial can be explained by the highly politicized environment in the District of Columbia, which has caused and created an attorney discipline apparatus that has

disparately and selectively targeted attorneys who are conservative and Republican activists for removal from the practice of law.

30.    The fact that Mr. Klayman and numerous prominent Republican and conservative activist attorneys have become targeted for legal removal in the District of Columbia has even been observed by Harvard law professor emeritus Alan Dershowitz's latest book, "Get Trump," which compared the state of affairs to the "kind of ridicule that suspected communists faced during the era of Sen. Joe McCarthy in the 1950s."[1] Professor Dershowitz stated:

> If you are perceived as enabling Trump in the in the [left-wing] communities of New York and Washington, D.C., your personal life will be affected; and judges are influenced by that….That's why there cannot be a trial of Trump either in Manhattan or in the District of Columbia, because no judge will have the courage to throw out the case and have their personal and family and professional lives ruined. We are living in an age of left-wing McCarthyism, and I went through the original McCarthyism. This is extraordinarily dangerous.

Specifically, in "Get Trump" Dershowitz opined:

> In addition to targeting Donald Trump himself, the "Get Trump" campaign is also out to get his lawyers and anyone associated with him. The targeting of his lawyers is especially troubling, since it implicates the Sixth Amendment right to effective assistance of counsel. Good lawyers are understandably afraid of becoming the subjects of criminal or bar investigation if they dare to defend Trump. Even I, who has never been suspected or accused of any misconduct during my representation of Trump in the Senate, have been subject to punishment, cancellation, and a bar complaint. My family, too, has been attacked. Several first-rate lawyers have told me that they don't want to be "Dershiwitzed" – that is, subjected to the kind of punishments to which I have been subjected. *Id.* at 8.

> In at least one respect, the current attacks on our fundamental rights by "Get Trump" zealots are even more dangerous than the past attacks on our fundamental rights by McCarthyites. McCarthyites were generally old men who represented America's past. McCarthyism lasted less than a decade and its effects were quickly overcome. *Id.* at 10.

31.    Additionally, in an article titled *Democrats Work to Strip All Opponents of Representation in Court,* Joy Pullman, the executive editor of The Federalist, observes and

---

[1]  Michael Katz, Dershowitz to Newsmax: Left-Wing McCarthyism Targets Trump Defenders, Newsmax, Mar. 24, 2023, available at https://www.newsmax.com/newsmax-tv/alan-dershowitz-left-wing-mccarthyism/2023/03/24/id/1113761/

opines: "[d]iscplining conservative, or simply neutral, lawyers can strip Democrats' opponents of high-quality legal defense, erasing justice by skewing the legal playing field." "Democrats are not just seeking to eliminate competent legal defense from Trump. They're pursuing lawyers who oppose their policies in any domain…." Ms. Pullman lists numerous examples of this, including William Barr, Jeff Clark, John Eastman, Ken Paxton, and Kari Lake. An attorney who was targeted in this ongoing scheme, Jim Bopp, Jr., was quoted: "[t]heir most sweeping goal is to discourage and chill lawyers from representing Republicans and conservatives, particularly in election law cases. They want to apply a much higher standard in order to punish them."

32.    Recently, it has been revealed that Bar Disciplinary Counsel Hamilton Fox III ("Fox") has personally gone after other Trump affiliated Republican legal counsel, such as Jeffrey Clark and Rudy Giuliani, often gloating to the media about his personal involvement. This is incredibly telling because it is almost unheard of for Bar Disciplinary Counsel to personally handle, try and litigate cases himself and not delegate them to his Deputy or Assistant Bar Disciplinary Counsel, so the fact that he chose to personally take on these matters shows conclusively what Fox's motivation is about, since it is nearly unheard of for Bar Disciplinary Counsel to take on and litigate these matters himself. With regard to Jeffrey Clark, the DCCA had step in and stop Fox and ODC's attempts to strip away Mr. Clark's constitutional Fifth Amendment rights, and Fox responded by saying "I'm not going to push that hearing back unless somebody cuts off one of my arms."[2]

33.    This is underscored by the fact that during the Trump years in particular, ethics complaints were filed, accepted and initiated against Trump White House Counsellor Kellyanne

---

[2]    https://www.politico.com/news/2024/02/26/jeff-clark-subpoena-trump-bar-investigation-00143469.

Conway[3] over remarks she made on cable news, against former Trump Attorney General William Barr[4] (the complaint was outrageously and incredibly filed by all prior presidents of the District of Columbia Bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[5] and Josh Hawley[6] over their role in advocating for President Trump in the last presidential election, Professor John Eastman[7] who served as a legal counsel for President Trump, and of course former U.S. Attorney Rudy Giuliani[8] over his representation of President Trump, to name just a few. Indeed, Giuliani was just recently disbarred by the Bar over his association with and legal representation of President Trump.[9]

34.    As evidence of disparate, selective First Amendment selective viewpoint discrimination, the Court must look to the treatment afforded to leftist Democrat lawyers David Kendall, Kevin Clinesmith, and Marc Elias.

35.    When a complaint was filed against leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's

---

[3]    https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[4]    https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

[5]    https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[6]    https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

[7]    https://www.reuters.com/legal/ex-top-justice-dept-officials-testimony-sought-ethics-hearing-trump-ally-clark-2022-10-06/

[8]    https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

[9]    https://www.cnn.com/2024/09/26/politics/rudy-giuliani-disbarred-washington-dc/index.html

33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by former Justice Department lawyer and conservative lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well.[10]

36.    Next, this Court need only look to the matter of Kevin Clinesmith in *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.). In that case, Kevin Clinesmith—the former senior FBI lawyer and admittedly anti-Trump partisan who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC and only temporarily suspended for only <u>five months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity.

37.    Clinesmith did not submit an affidavit, as required under Rule 14(g), for five (5) months after he was suspended. Despite this, not only did the D.C. attorney disciplinary apparatus fast-track, if not whitewash, his case—clearly in order to minimize his temporary suspension period —this D.C. Court of Appeals let Clinesmith off with barely a slap on the wrist with "time served" in just seven (7) months, likely due to inappropriate if not conflicted insider influence by his counsel, Eric Yaffe, Esq., the former chairperson of the Board and who now incredibly and conveniently represents the Board against Mr. Klayman in ongoing litigation styled *Klayman v, Board on Professional Responsibility*, 24-cv-0366 (D.C. Ct. App.) (the "Bundy Litigation"). And importantly, this Court imposed no reinstatement provision on Clinesmith despite him literally being a convicted felon over making false statements to the

---

[10] Ty Clevenger, State bar prosecutors are flouting the law, protecting Hillary Clinton and her lawyers, LawFlog, available at: https://lawflog.com/?p=1389

government. In stark contrast, the Michigan Bar automatically suspended Clinesmith immediately upon his felony conviction, and then ordered a suspension period of two (2) years.[11]

38.    Lastly, attached hereto and incorporated by reference is a report written by Paul Sperry titled "Trump's Toughest Foe Could Be Harris Lawyer Marc Elias" (the "Elias Article"). Exhibit B. The Elias Article details how Marc Elias' ("Elias") efforts to use the court system to prevent Donald Trump from being elected president. The Elias Article details in pertinent part:

> The longtime Democratic Party lawyer has already filed more than 60 preelection lawsuits to stop Trump from becoming president again by combatting what he calls Republican "voter suppression" efforts such as requiring voters to provide identification at the polls.
>
> …
>
> At the same time, Elias has been sending letters to election officials in Georgia and other key swing states threatening legal action if they uphold challenges to voter rolls to remove noncitizens and other ineligible registrants.
>
> …
>
> As general counsel to Hillary Clinton's 2016 presidential campaign, he helped lead the effort to manufacture and leak spurious "opposition research" claiming to reveal illicit ties between Trump and Russia. Elias later testified that he was worried – then as now – that Trump was a threat to democracy: "I received information that was troubling as someone who cares about democracy." That "information" turned out to be a fictitious "dossier" linking Trump to the Kremlin crafted by former British spook and FBI informant Christopher Steele, who huddled with Elias in his Washington office.
>
> …
>
> But Elias has since taken on other clients – including Kamala Harris – who have more than made up for the loss in revenue. So far in this election cycle, the latest FEC filings show the Elias Law Group has received a total of more than $22 million in disbursements from a host of major Democratic and anti-Trump clients.

---

[11]    https://www.michbar.org/journal/Details/Orders-of-Discipline-and-Disability-November-2021?ArticleID=4277

39.     Elias' efforts with regard to the 2016 election, "[s]pecial Counsel John Durham found Elias intentionally sought to conceal Clinton's role in the dossier. According to court records, Elias acted as a cutout for more than $1 million in campaign payments for the dossier." As the Elias Article set forth, the Durham probe as disclosed by Paul Sperry "**raised ethical issues with the D.C. Bar** and Elias' former law firm, Perkins Coie, reportedly leading to their breakup in August 2021…." Exhibit B. Given that Elias was never disciplined by the D.C. bar, the only possible conclusion is that this was also covered up and buried by the D.C. attorney discipline apparatus.

40.     This is the exact type of discriminatory selective prosecutorial discriminatory treatment that the U.S. Court of Appeals for the District of Columbia Circuit has found to be unconstitutional and illegal in *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) ("*Douglass*").

41.     *Douglass* involved the Frederick Douglass Foundation ("Foundation"), a pro-life foundation, which had its advocates arrested for writing with chalk "Black Pre-Born Lives Matter." *Id.* at 1131. The Foundation sued the District of Columbia, alleging among other causes of action, First Amendment free speech selective enforcement. As evidence of disparate treatment, the Foundation pointed to the fact that in the summer of 2020, "thousands of protesters flooded the streets of the District to proclaim 'Black Lives Matter.' Over several weeks, the protesters covered streets, sidewalks, and storefronts with paint and chalk. The markings were ubiquitous and in open violation of the District's defacement ordinance, yet none of the protesters were arrested." *Id.* The D.C. Circuit found that both the Foundation and the BLM protestors were similarly situated and that the Foundation had adequately alleged that the

District of Columbia had engaged in viewpoint selective prosecutorial discrimination in violation
of the First Amendment:

> In particular, the District permitted individuals expressing the "Black Lives
> Matter" message to violate the defacement ordinance, as evidenced by the
> widespread painting, graffiti, and other defacement on public sidewalks, streets,
> and buildings, and on private property. By making no arrests, the police
> effectively exempted advocates of the "Black Lives Matter" message from the
> requirements of the ordinance. In contrast, the police showed up in force to the
> Foundation's small rally and arrested individuals who chalked "Black Pre-Born
> Lives Matter" on the sidewalk. *Id.* at 1142.

42.     The D.C. Circuit reasoned and ruled: "It is fundamental to our free speech rights
that the government cannot pick and choose between speakers, not when regulating and not
when enforcing the laws." *Id.* at 1141. "[T]he government has no authority to license one side to
fight freestyle, while forbidding the other to fight at all." *Id.* at 1142. "The government may not
enforce the laws in a manner that picks winners and losers in public debates. It would undermine
the First Amendment's protections for free speech if the government could enact a content-
neutral law and then discriminate against disfavored viewpoints under the cover of prosecutorial
discretion." *Id.* at 1142.

43.     It is clear to see how *Douglass* applies to this instant case. Conservative and
Republican activist public interest attorneys have been prosecuted by ODC while, as set forth
above, convicted felons such as Clinesmith who has committed egregious ethics violations
involving dishonesty are barely given a "slap on the wrist" simply because they were Democrat
leftists adverse to Trump and employed as counsel the insider influential former Chairman of the
Board Eric Yaffe – consistent with the overarching goal of silencing and abridging the First
Amendment rights of activist conservative and Republican attorneys, such as Mr. Klayman.

### *Facts Pertaining to Disciplinary Proceeding*

44.     It was under this partisan, compromised, and corrupted political atmosphere that Mr. Klayman was summoned before the AHHC comprised of Defendants Mims, Bell, and White in July of 2019 and September of 2019 for disciplinary proceedings initiated by ODC for his efforts to gain entry into the Bundy Trial *pro hac vice*.

45.     At this hearing, Mr. Klayman not only produced numerous character witnesses who testified glowingly in favor of him, but he even had Professor Erwin Chemerinsky ("Dean Chemerinsky") of the University of California at Berkeley's Boalt Hall testify pro bono on his behalf. Dean Chemerinsky testified that he did not believe that Mr. Klayman did anything unethical and that Mr. Klayman's actions were reasonable:

> Yes, I do. I think that it was reasonable under the circumstances of the case…
> This is about the ability of a criminal defendant to have counsel of choice; that the
> district court had refused to allow the pro hoc vice status; and the defendant
> wanted to have Mr. Klayman represent him. And the only way of having the
> district court decision reviewed was through these writs of mandamus. <u>Exhibit C.</u>

46.     To the contrary, ODC did not have a single witness, and instead had its incredibly conflicted prosecutor, Julia Porter ("Porter") serving as both prosecutor and witness[12].

---

[12] On occasion, some members of ODC, such as Deputy Bar Counsel Porter have engaged in unethical and dishonest conduct themselves, as evidenced by her crusade to have a father and son law firm of J.P. and John Szymkowicz – not coincidentally with J.P. being the only conservative white male Republican member of the D.C. city government – removed from the practice of law on a contrived and fraudulent Bar disciplinary proceeding involving an alleged female victim that lasted thirteen (13) years which drove them to the brink of bankruptcy by causing them to lose clients and causing  extreme emotional distress. When Porter ultimately failed to obtain disbarment or any sanction at all, she had former Senior Assistant Bar Disciplinary Counsel Michael Frisch, now professor at Georgetown Law School and, like Porter, a leftist Democrat, to defame them in his public blog postings, a tactic that she also used with Mr. Klayman. *See Klayman v. Porter et al*, 1:21-cv-727 (D.D.C.). This gave rise to the Board committing to do an internal review of Porter's conduct when the former chairman of the Board Richard Bernius wrote: "The Board, however, may conduct an administrative review of allegations of misconduct against members of the Office of Disciplinary Counsel. We will undertake such a review in this case." App. 243. This was however later deep sixed when the new chairman, Matthew Kaiser ("Kaiser"), took over. This can be explained by the fact that Kaiser has proven to be a leftist Democrat who was who was associated with the leftist legal publication "Above the Law," and wrote complementary columns extolling the virtues of an "honest" Hillary Clinton, but trashing Donald Trump, who Mr. Klayman had supported. Kaiser was even lead counsel a civil lawsuit which he filed against Donald Trump, *Garza v. Trump* et al, 1:23-cv-00038 (D.D.C.), which

47.     It is therefore no surprise that at the conclusion of first three-day hearing before the AHHC on July 18, 2019, when the facts and evidence were fresh in the committee members' minds,  the chairperson, Defendant Mims stated on the record that "the Hearing Committee has been unable to reach a non-binding determination." Exhibit D. This finding, coming at this preliminary stage, is rare and unique, as hearing committee usually provisionally issues non-binding rulings which then permit them to take evidence on factors involving mitigation and/or aggravation. This was memorialized in the AHHC's August 8, 2019 order which stated:

> Following the conclusion of the evidentiary portion of the hearing and the parties' respective closing arguments, the Hearing Committee went into executive session and determined that it could not make a preliminary finding that Disciplinary Counsel had proven any disciplinary rule violation. Exhibit D.

48.     Then, for over four (4) years – almost an egregious and unbelievable half a decade - the AHHC went silent, leaving Mr. Klayman to very reasonably to rightly conclude that this matter had been laid to rest and thus disposed of, given the AHHC's finding after the hearing that ODC had failed to prove any ethical violations as well as because of Board Rule 12.2 ("Rule 12.2), which was promulgated by Defendant DCCA:

> The Hearing Committee's report shall be filed with the Board **not later than 120 days following the conclusion of the hearing.** The 120 days provided for by the Court's rules for the preparation of the Hearing Committee's report shall start to run at the conclusion of the hearing.

49.     Yet, on September 20, 2023 – over four (4) years after the AHHC Hearing concluded - nearly half of a decade later -  the AHHC incredibly without factual, legal and other bases reversed course 180 degrees and issued an AHHC Report and instead recommended a one-year suspension with a reinstatement provision.

---

lawsuit defies well-settled principles of presidential immunity. Like Mr. Klayman, J.P. and his father were not ideological kin to Kaiser.

50.     Rule 12.2 is the equivalent of a statute of limitations and thus the fact that the AHHC let this limitations period run means that this matter must be summarily dismissed. However, even under the improper and erroneous interpretation of Rule 12.2 as not being the equivalent of a statute of limitations, Defendants Mims, Bell, and White chose not to ask this Court – which promulgated Rule 12.2 – for an extension of time, however improper, to submit their Report, and thus, any such request would therefore be waived, particularly given the egregious four (4) year delay.

51.     It more than appears that given this egregious and violative passage of time, the Defendants Mims, Bell, and White simply forgot everything that occurred at the hearing back in 2019 and thus made the decision to simply "rubber stamp" what was presented to them back in 2019 by ODC and Porter. This is improper for a litany of reasons, none more compelling than the fact that ODC and Porter already made all of their same arguments at the 2019 AHHC hearing. Absolutely nothing new was put into the record in the interim four (4) year period of delay. Thus, the only explanation for the AHHC reversing course nearly half of a decade later is that they simply copied and adopted wholesale the briefs of Porter and ODC from 2019 given that the four (4) year delay has caused them to either forget everything that happened at the AHHC hearing, or simply wanted to harm Mr. Klayman, his family and his colleagues given his support of Donald Trump, who was then running for President again in the 2024 presidential election.

52.     Even more, it has become regrettably evident recently that the purpose for this four (4) year delay logically had to be carefully conceived, during a highly charged partisan period in our nation's history when supporters of President Donald Trump have been under attack, to "stack" disciplinary proceedings against Mr. Klayman to ensure that he remains

ineligible to practice law in the District of Columbia given that he has only recently on August 6, 2024 petitioned for reinstatement to practice following the conclusion of the suspension period in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"), which order is still being seriously challenged and currently on appeal and under review by this Court. *Klayman v. Sataki et al*, 24-cv-0226 (D.C. Ct. App.).

53.    This type of "stacking" of disciplinary proceedings has been found to be illegal and unethical in jurisdictions such as Florida. *Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978*)*. Here the Supreme Court of Florida, which is the highest authority in Florida just as this Court is here in the District of Columbia, in dismissing the disciplinary complaint against the respondent attorney, Ellis Rubin, held:

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee 's report which it finds loo lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. (emphasis added).

*See also Fl. Bar v. D'Ambrosio*, 25 So. 3d 1209 (Fla. 2010)(referring to the practice of "stacking" disciplinary proceedings as "unfair."). **Again, the disciplinary complaint against the attorney in *Rubin* was dismissed**.

54.    When Mr. Klayman brought the egregious violation of Rule 12.2 to the Board's attention, the Board and the Board Defendants incredibly refused to enforce Rule 12.2 with regard to Mr. Klayman. This led to the Bundy Litigation where Mr. Klayman sought injunctive relief in the form of an order directing the Board to enforce Rule 12.2, and which is currently on appeal to the Defendant DCCA.

55.    Mr. Klayman also asked the Defendant DCCA to stay the Bundy Matter pending the Bundy Litigation, as the Bundy Litigation would moot out the Bundy Matter, but the Defendant DCCA refused to even grant this stay, which would be in the interests of judicial economy and fundamental fairness and justice, particularly since Mr. Klayman's financial resources will be severely taxed by having to defend a time-barred and non-meritorious disciplinary proceeding. This refusal to stay the Bundy Matter regrettably necessitated this instant litigation.

56.    On information and belief, and which will be borne out in discovery, the refusal to enforce Rule 12.2 to dismiss the Bundy Matter is due to Mr. Klayman's conservative and Republican activism, speech, association, and beliefs. On information and belief, there are many other examples of the Defendants selectively enforcing the Board Rules to the benefit of leftist and Democrat attorneys and to the detriment of conservative and Republican activist attorneys.

57.    Indeed, Porter and ODC's motivation is no secret, as at the conclusion of the AHHC hearing in the Bundy Matter, Defendant Porter couldn't help but to blurt out that Mr. Klayman "should not continue to have the privilege of being a lawyer," evidencing that she was being driven by a personal animus and dislike for Mr. Klayman, as with J.P. Szymkowicz, also as a white male conservative and Republican activist attorney.

58.    Accordingly, the ongoing Bundy Matter was brought in bad faith for the purpose of harassing Mr. Klayman and chilling his constitutional rights.

59.    The state court is an inadequate forum to adjudicate this matter because the DCCA is named as a party to this matter and therefore would have a conflict of interest in ruling on its own unconstitutional conduct. Furthermore, this Complaint has alleged the inherent biases

of the state court, which governs all of the Defendants and oversees the entire attorney discipline process.

60.     Under 28 U.S.C. § 2283, a court of the United States may enjoin a state court proceeding where it is necessary to "protect of effectuate its judgments." In this case, the judgment at issue is the *Douglass* Opinion, and the Defendants cannot be allowed to intentionally ignore the holding of the *Douglass* Opinion in selectively and disparately targeting conservative and Republican attorneys for removal from the practice of law

61.     This is not what the disciplinary process was meant to be. It should be based on facts and law, not personal and political biases. Instead, the Defendants have, with discriminatory intent, selectively and disparately targeted conservative and Republican attorneys, such as Mr. Klayman, for removal from the practice of law. This is expressly forbidden under *Douglass*.

62.     Importantly, "[i]t has long been established that the loss of constitutional freedoms, `for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). Mr. Klayman's constitutional rights have been egregiously violated by the Defendants here, as there is no immunity for unconstitutional acts. *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

63.     Accordingly, this Court must enter an order dismissing the Bundy Matter.

64.     Furthermore, the AHHC Defendants and the Board Defendants were not acting within the scope of their official duties because enforcing Rule 12.2 – as well as all of the Board Rules – is the fundamental purpose of their positions. Thus, intentionally refusing to enforce Rule 12.2 is the equivalent of intentionally refusing to perform their official duties, and thus, the

allegations set forth herein clearly fall outside the scope of the AHHC Defendants and the Board

Defendants' official duties for which they are not immune. *Loper Bright Enterprises et al v.*

*Raimondo, Secretary of Commerce, et al*, 22-451 (U.S. 2024). *See also Trump v. United States*,

23-939 (U.S. 2024).

## FIRST CAUSE OF ACTION
### *Violation of the First Amendment to the U.S. Constitution*
### *Freedom of Association*

65.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety

of this Complaint, including, but not limited to, the Introduction and the exhibits to this

Complaint, with the same force and effect, as if fully set forth herein again at length.

66.     The First Amendment to the U.S. Constitution protects the right to freedom of

association.

67.     Mr. Klayman holds conservative and Republican activist views, including support

of Trump, and associates with other conservative and Republican activist attorneys for the

purpose of more effectively expressing that viewpoint and ideology.

68.     The Defendants' selective and discriminatory prosecution of conservative and

Republican activist attorneys chills, deters, and restricts Mr. Klayman from participating in

activities organized around his conservative and Republican activist views.

69.     The Defendants' selective and discriminatory prosecution of conservative and

Republican activist attorneys serves no legitimate or compelling government interest and is not

narrowly tailored to further any government interest.

70.     The Defendants' selective and discriminatory prosecution of conservative and

Republican activist attorneys impermissibly infringes on Mr. Klayman's right to associate on the

basis of his conservative and Republican activist beliefs.

71.     The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys is therefore unconstitutional under the First Amendment to the United States Constitution.

72.     In violating Mr. Klayman's First Amendment rights, Defendants were acting under the color of state law

73.     Accordingly, the Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys entitles Mr. Klayman to damages pursuant to 42 U.S.C. § 1983 against the individual AHHC Defendants and the individual Board Defendants as well as the injunctive and equitable relief as set forth in the Prayer for Relief.

## SECOND CAUSE OF ACTION
*Violation of the First Amendment to the U.S. Constitution*
*Freedom of Speech*

74.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

75.     The First Amendment to the U.S. Constitution protects the right to freedom of speech.

76.     Mr. Klayman holds conservative and Republican activist views, including support of President Trump, and engages in public speech furthering his conservative and Republican activist views as part of his duties as a prominent conservative and Republican public interest activist and attorney.

77.     The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys chills, deters, and restricts Mr. Klayman from engaging in public speech furthering his conservative and Republican activist views.

78.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys serves no legitimate or compelling government interest and is not narrowly tailored to further any government interest.

79.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys impermissibly infringes on Mr. Klayman's right to engage in public speech furthering his conservative and Republican activist views.

80.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys is therefore unconstitutional under the First Amendment to the United States Constitution.

81.    In violating Mr. Klayman's First Amendment rights, Defendants were acting under the color of state law.

82.    Accordingly, the Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys entitles Mr. Klayman to damages pursuant to 42 U.S.C. § 1983 against the individual AHHC Defendants and the individual Board Defendants as well as the injunctive and equitable relief as set forth in the Prayer for Relief.

### THIRD CAUSE OF ACTION
*Violation of the Fifth Amendment to the U.S. Constitution*
*Due Process*

83.    Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

84.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution requires that the government treat all similarly situated individuals equally.

85.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys has impermissibly subjected Mr. Klayman to unequal treatment from similarly situated individuals, namely leftist and Democrat attorneys.

86.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys serves no legitimate or compelling government interest and is not narrowly tailored to further any government interest.

87.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys impermissibly in the form of applying the Board Rules to some members of the D.C. Bar, while refusing to apply the Board Rules to other members of the bar based on their political beliefs and ideologies has impermissibly subjected Mr. Klayman to unequal treatment compared to similarly situated individuals, namely leftist and Democrat attorneys.

88.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys is therefore unconstitutional under the Fifth Amendment to the United States Constitution.

89.    In violating Mr. Klayman's Fifth Amendment rights, Defendants were acting under the color of state law.

90.    Accordingly, the Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys entitles Mr. Klayman to damages pursuant to 42 U.S.C. § 1983 against the individual AHHC Defendants and the individual Board Defendants as well as the injunctive and equitable relief as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Klayman prays that

(1) the Bundy Matter be dismissed pursuant to Rule 12.2 and the First and Fifth Amendments of the U.S. Constitution;

(2) actual, compensatory, and punitive damages in a sum to be determined at trial for a violation of his constitutional First Amendment rights under 42 U.S.C. § 1983 against the individual AHHC Defendants and the individual Board Defendants;

(3) preliminary and permanent injunctive relief against all the Defendants;

(4) an award of attorneys fees and costs; and

(5) any other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts, as to all issues so triable.

DATED: October 22, 2024

Respectfully submitted,

Larry Klayman
Klayman Law Group P.A.
7050 W. Palmetto Park Road
Boca Raton, FL 33433
Email: leklayman@gmail.com
Tel: 561-558-5336

*Plaintiff Pro Se*

# EXHIBIT A

# ABOUT LARRY KLAYMAN

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at www.FreedomWatchUSA.org**

# EXHIBIT B



10/21/24, 3:01 PM

Trump's Toughest Foe Could Be Harris Lawyer Marc Elias | RealClearInvestigations



**Trump's Toughest Foe Could Be Harris Lawyer Marc Elias**

By Paul Sperry, RealClearInvestigations
October 10, 2024

YouTube

If Donald Trump gets past Kamala Harris on Nov. 5, he'll likely face a fiercer opponent in court – her campaign attorney, Marc Elias.

The longtime Democratic Party lawyer has already filed more than 60 preelection lawsuits to stop Trump from becoming president again by combatting what he calls Republican "voter suppression" efforts such as requiring voters to provide identification at the polls. Echoing a standard Democratic talking point, Elias maintains that such requirements are "racist" strategies designed to make it harder for minorities to vote.

At the same time, Elias has been sending letters to election officials in Georgia and other key swing states threatening legal action if they uphold challenges to voter rolls to remove noncitizens and other ineligible registrants. Some Georgia officials complain that his intimidation tactics are interfering with county registrars' ability to check the qualifications of voters.

If Trump is declared the winner, the hard-charging attorney threatens to overturn his election by deploying an army of more than 75 lawyers to sue for ballot recounts in several swing states. Trump, in turn, has threatened to lock Elias up for election interference, as ABC News moderator David Muir pointed out in last month's presidential debate between Trump and Kamala Harris.

Elias symbolizes the growing impact of lawfare on U.S. elections as both parties are turning increasingly to the courts to gain an edge. According to a newly disclosed Republican National Committee memo, the Trump campaign has filed or joined 123 election lawsuits in 26 states, 82 of which are in battleground states, to combat what it describes as voter fraud. It has also hired thousands of lawyers to fend off what a Trump lawyer expects will be "an onslaught of litigation" from the Harris campaign contesting the results of the election. Of course, that army of lawyers will also be used to push recounts should Trump lose.



Elias keeps a sign behind his desk that says "BEWARE OF ATTACK DEMOCRAT."

MSNBC

Election experts say that these GOP efforts – fueled, in part, by Trump's claim that Democrats stole the 2020 election – are playing catch-up. Democrats have long been at the forefront of strategies to use the court to impact elections, and no one has been more important to that cause than Elias, who keeps a sign behind his desk that warns: "BEWARE OF ATTACK DEMOCRAT."

To many Democrats, he is a hero. The headline of a 2022 profile of Elias in the New Yorker called Elias, "The First Defense Against Trump's Assault on Democracy."

Conservatives tend to see Elias in a much different light. "Mr. Elias is part of a massive and well-funded partisan leftist operation notorious for using lawfare to undermine election integrity," says Tom Fitton, president of Judicial Watch. "Making it easier to steal elections is the antithesis of 'democracy.'"

Nevertheless, in the expanding world of lawfare, Elias, a 55-year-old graduate of Duke University's law school, continues to stand apart. While scoring many victories in the courtroom, he has also worked closely with campaigns on partisan efforts that have little to do with jurisprudence.

### More Than a Courtroom Partisan

As general counsel to Hillary Clinton's 2016 presidential campaign, he helped lead the effort to manufacture and leak spurious "opposition research" claiming to reveal illicit ties between Trump and Russia.



Elias later testified that he was worried – then as now – that Trump was a threat to democracy: "I received information that was troubling as someone who cares about democracy." That "information" turned out to be a fictitious "dossier" linking Trump to the Kremlin crafted by former British spook and FBI informant Christopher Steele, who huddled with Elias in his Washington office.



Elias was deeply involved in Christopher Steele's spurious dossier linking Trump to Russia.

AP

"Some of the information that was in it I think has actually proved true. It was accurate and important," Elias testified in a closed-door hearing on Capitol Hill in December 2017, according to a declassified transcript. Actually, Steele's allegations proved to be a collection of improbable rumors and fabricated allegations invented by Steele's top researcher and a Clinton campaign adviser.

Nonetheless, the disinformation was fed to the FBI and media, igniting criminal investigations (including illegal electronic surveillance), congressional probes, and a media frenzy that crippled Trump's presidency with bad press for years.

In a parallel operation against Trump, Elias worked with his then-law partner Michael Sussmann and Clinton campaign officials – including Jake Sullivan, who is now President Biden's national security adviser – to develop misleading evidence of a "secret hotline" between Trump and Russian President Vladimir Putin that allegedly used a "back channel" connection between email servers at Trump Tower and Russian-owned Alfa Bank. These false allegations were posted on social media and brought to the attention of the FBI, triggering a separate criminal investigation targeting Trump and his campaign. Like other Russiagate probes, it was eventually discredited.

But the damage was done. By spreading fake Russian dirt on Trump, Elias was able to create scandals that dogged Trump for years, tarnishing his electability. The Democratic lawyer's machinations, however, drew scrutiny from other investigators and hurt his own reputation – albeit temporarily.

During his probe of Russiagate, Special Counsel John Durham found Elias intentionally sought to conceal Clinton's role in the dossier. According to court records, Elias acted as a cutout for more than $1 million in campaign payments for the dossier. By laundering its payments through a law firm, the Clinton campaign and Elias were able to claim attorney-client confidentiality when Durham sought their internal emails (the assertion of that privilege also blocked investigators from accessing communications between Elias and Steele's immediate employer, the Washington-based opposition research firm, FusionGPS). But their shell game got the Clinton campaign in trouble with the Federal Election Commission, which later fined it and the Democratic National Committee $113,000 for misreporting the purpose of the payments as "legal expenses," rather than opposition research, in violation of FEC laws.

The Durham probe, which Elias insists was "politically motivated," nonetheless raised ethical issues with the D.C. Bar and Elias' former law firm, Perkins Coie, reportedly leading to their breakup in August 2021, when Elias suddenly left the powerhouse after almost 30 years. The firm, which Elias had joined fresh out of law school in 1993, grew "increasingly uncomfortable" with the unwanted scrutiny the Durham probe invited on it, according to published reports. The veteran prosecutor exposed questionable billing practices by the firm. Durham also revealed the Democratic firm had set up an FBI workspace within its Washington offices, further calling into question the FBI's impartiality in investigating Trump.



Special Counsel John Durham found Elias served as cutout for Hillary Clinton's dirty tricks in 2016.

AP

In late 2021, Elias opened his own firm, the Elias Law Group, but soon lost major clients who reportedly grew weary of his aggressive tactics and go-it-alone style. Last year, the DNC severed its 15-year relationship with Elias; then more recently, the Biden campaign parted company with him. In 2020, Elias had quarterbacked Biden's legal team that fought Trump's claims in court that the election had been stolen. He also beat back GOP measures to ensure election integrity

after Democrats took advantage of the COVID-19 pandemic to dramatically loosen rules for voting – including allowing ballot harvesting, drop boxes, and ballots arriving up to four days after Election Day to still be counted.

Top Democratic Party officials were said to sour on Elias after he filed election-related lawsuits without consulting with them, some of which backfired with unfavorable – and lasting – rulings. Biden's team reportedly also became frustrated with his fees. Elias billed the DNC and Biden campaign more than $20 million during the 2020 election cycle.



Elias has been retained by Vice President Kamala Harris for post-election litigation and recounts.
**AP**

But Elias has since taken on other clients – including Kamala Harris – who have more than made up for the loss in revenue. So far in this election cycle, the latest FEC filings show the Elias Law Group has received a total of more than $22 million in disbursements from a host of major Democratic and anti-Trump clients. In addition to the Harris For President campaign, where he's in charge of recounts and post-election litigation (it's not known if he also has a hand in opposition research, as he did in 2016), Elias has signed retainer agreements with the:

- Democratic Congressional Campaign Committee
- Democratic Senatorial Campaign Committee
- [Democratic] Senate Majority PAC
- Stop Trump PAC
- The Lincoln Project

Elias has also been retained by Mind The Gap, a political action committee set up to help Democrats take back the House. Mind The Gap was founded by Barbara Fried, the mother of convicted crypto kingpin Sam Bankman-Fried. In a lawsuit filed last year, Fried, a Stanford law professor, is accused of orchestrating a potentially illegal scheme to funnel political contributions from her son to her PAC.

Among Elias' other clients are Democratic Rep. Adam Schiff, a leader of House efforts to impeach Trump who, records show, is shelling out a six-figure retainer for Elias as he runs for an open U.S. Senate seat in California, and Democratic Rep. Dan Goldman, who previously served as Schiff's chief counsel during the first Trump impeachment.

Elias also represents Democratic Sen. Sherrod Brown of Ohio, who polls show is narrowly leading GOP challenger Bernie Moreno in his race for reelection, according to the RealClearPolitics Average. That race could determine control of the Senate.

The business of political lawfare – or "protecting democracy," as Elias calls his job – has made the super lawyer super-rich. The most recent property records show Elias lives in a $2.6 million mansion in Great Falls, Va., and FEC records show he has the wherewithal to donate generous sums to his party, including a combined total of at least $65,000 in gifts to the Democratic Congressional Campaign Committee and the Democratic Senatorial Campaign Committee.

"Aggressive Bully"

"Aggressive Bully"

Elias first earned his reputation as a fierce and effective advocate in 2009, when he won an eight-month recount battle to get his client, Al Franken, elected to the Senate. He also scored a series of victories against the Trump campaign in 2020.

"My team and I beat [Trump] in court 60-plus times," Elias boasted on X last month, in his trademark brashness. "Here is my message to the GOP: If you try to subvert the election in 2024, you will be sued and you will lose."

Representing Biden electors in Arizona, for example, Elias in late 2020 defeated a post-election Trump lawsuit alleging voter fraud in Maricopa County by arguing at trial the plaintiff showed the court only "garden variety errors" but provided "no evidence about misconduct, no evidence about fraud, no evidence about illegal votes."

But Elias' aggressive posture has also backfired.

In 2016, he sued Arizona to strike down two laws that, he argued, made it harder for blacks and Hispanics to vote. One banned the practice of partisans going door-to-door and collecting mail-in ballots and bringing them to a polling place, and the other canceled ballots that were cast at the wrong precinct. Elias argued the measures violated a key part of the Voting Rights Act – Section 2 – prohibiting states from passing voting laws that discriminate based on race. After a lower court in Arizona refused to block the measures prior to the election, Elias appealed and won a favorable ruling from the liberal U.S. Ninth Circuit Court of Appeals. But in the case, *Brnovich v. DNC,* the U.S. Supreme Court sided with Arizona, ruling that the state's ballot-integrity measures lacked discriminatory intent.

UCLA law professor Rick Hasen speculates that the conservative Supreme Court used the *Brnovich* case as "an opportunity to weaken" Section 2, which Democratic voting-rights lawyers have relied on as a tool for civil rights enforcement. Regardless of the justices' motives, the *Brnovich* decision does establish a precedent whereby voting rules resulting in only small disparities for voters of color can no longer be challenged. Some Democrats complain that Elias' loss in Arizona opened the door for all red states to impose "restrictions" on voting.



"Marc didn't listen to such criticism and he brought an extremely weak Voting Rights Act case in Arizona to disastrous results," Hasen wrote in a recent blog. "It is fine to be zealous in one's advocacy," he added, "but one need not be an aggressive bully."

UCLA's Rick Hasen characterized Elias as an "aggressive bully."
**Wikimedia**

Elias has also aggravated judges. He's been disciplined for filing frivolous lawsuits and motions. In 2021, for instance, the U.S. Court of Appeals for the Fifth Circuit sanctioned Elias for refiling a motion that was previously rejected by a lower court "without disclosing the previous denial." The appellate court ordered him to pay attorneys' fees and court costs incurred by opponents in the Texas election case over his "duplicative" motion.

"Using lawfare as Elias does is legal – unless the litigation is frivolous," said Paul Kamenar, general

~~sing laware as Elias does is legal~~ – unless the litigation is frivolous," said Paul Kamenar, general counsel for the National Legal and Policy Center in Washington.

Elias and an attorney representing him did not reply to requests for comment. But in a previous interview, he dismissed the criticism that he is unnecessarily belligerent, arguing that the "existential threat Trump poses to democracy" demands tough action. He acknowledged that he can be brusque but explained he discarded lawyerly circumspection and restraint after Trump's 2016 election "radicalized" him.

"And so I became a much more polarized person and a more polarizing lawyer," Elias told The New Yorker.

In a recent column for his Democracy Docket website, Elias attacked Trump as another "Hitler" who is "plotting to overthrow American democracy." He even warned that a reelected Trump "is almost certain to convert the military into his personal domestic police force" and "seize voting machines [and] control ballot counting," even though state laws govern elections.

Still, he denies filing groundless grievances over voting rules. He insists many of the tighter rules imposed by Republicans serve no legitimate purpose. And he doesn't buy their argument that they're needed to stop fraudulent voting because, as he claims, voter fraud is rare (or, more precisely, rarely prosecuted).

### Anti-Trump War Room

"Republicans are working every day to make it harder to vote," Elias recently posted on X. "They are also planning to subvert the elections when they lose."

Noting the GOP's flurry of preelection lawsuits, including in the battleground states of Pennsylvania, Michigan, Nevada, and North Carolina, Elias recently told MSNBC that Republicans will do anything to push Trump over the top because he cannot win on his own. "He is set to lose to Kamala Harris," Elias claimed, "and Republicans know that their only way of winning this election is by intimidating voters, making it hard for voters to participate in the process, and by setting up a structure after the election for them to be able to engage in the kind of frivolous and harassing litigation and ultimately the kind of tactics we saw in 2020 – but on a much wider scale."



Elias says he is now litigating 66 anti-Trump lawsuits in 23 states, three times the number filed in 2020.
**Pool Getty Images/AP**

To combat this, "My law firm is litigating 66 voting and election lawsuits in 23 states," he said on X, with most of them concentrated in Arizona, Georgia, and Wisconsin. "And we are winning!" By comparison, Elias filed 20 voting-related lawsuits in 14 states at this point in the 2020 election cycle, making him more than three times as litigious this time.

His anti-Trump legal war room includes a for-profit operation he founded in 2020 called Democracy Docket LLC, which employs 16 and is housed in the same office as his law firm, records show. The digital platform tracks several hundred voting-related cases and publishes a weekly organ distributed to more than 225,000 paid subscribers (at $120 a year), who include lawyers, politicians, and journalists.

A sister operation, Democracy Docket Legal Fund, supports election litigation to protect the voting rights of primarily minority voters. Another spinoff, the Democracy Docket Action Fund, raises money for voting rights lawsuits. According to the Capital Research Center, the two organizations are bankrolled by millions

ot dollars in so-called dark money, including from leftwing billionaire George Soros – whom Elias has called "a hero." Through these vehicles, Elias has virtually "unlimited funding" to challenge any voting law in any state if he thinks it will help his party and his Democratic clients win elections, according to Americans for Public Trust, a government watchdog group based in Alexandria, Va.

While Elias publicly claims he's "defending free and fair elections," it's clear from his actions behind the scenes that his motives are purely partisan, critics say. Last month, he sent a letter to Virginia state election officials threatening to sue them if they don't remove Cornel West, the presidential nominee of the leftwing Justice for All Party, from the state ballot. Elias is also trying to keep West, a progressive black college professor, off the ballot in 15 other states, including key battlegrounds. These efforts clearly have nothing to do with voting rights. Elias is simply worried West will bleed off enough votes from his Democratic client Kamala Harris to cost her victories in states where she is leading by razor-thin margins against Trump.

In a column he wrote last year for Democracy Docket, Elias admitted: "A vote for No Labels, Robert F. Kennedy Jr., Cornel West or any other third-party candidate is effectively a vote for Trump."



In addition, Elias is quietly working with immigrant advocacy groups that want to make it possible for noncitizens to vote. In August, for example, Elias stepped in to represent El Pueblo in its quest to stop North Carolina's State Board of Elections from removing noncitizens from voter registration rolls as required by a 2023 law. An estimated 325,000 "unauthorized" immigrants reside in the state.

Elias is also suing to keep Cornel West off ballots in more than 15 states.
AP

As more than a dozen jurisdictions run by Democrats now allow noncitizens to vote in some local elections, the push to redefine who is eligible for the franchise promises to become an ever more potent and divisive issue in American politics. Much of this debate will almost certainly be hashed out in the courtroom battles and behind-the-scenes political maneuvering that are Marc Elias' special practice.

*After this article was published, Marc Elias's representative said a donation Elias had made to the nonprofit Just Neighbors was not in support of illegal immigrants. He said it was to help victims of a snowstorm in Vermont.*

*We're proud to make our journalism accessible to everyone, but producing high-quality investigative pieces still comes at a cost.*

*That's why we need your help. By making a contribution today, you'll be supporting RealClearInvestigations and ensuring that we can keep providing in-depth reporting that holds the powerful accountable.*

*Donate now and help us continue to publish distinctive journalism that makes a difference. Thank you for your support!*

**Support RealClearInvestigations →** 

# EXHIBIT C



RECEIVED

August 14, 2019

**Board on Professional Responsibility**

**Date:** July 18, 2019

**Case:** In Re:  Larry E. Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

In Re: Larry E. Klayman
July 18, 2019

Page 645

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY


- - - - - - - - - - -x

In re:                    :    Board Docket Number

LARRY E. KLAYMAN,         :    18-BD-070

        Respondent.       :    Bar No. 2017-D051

- - - - - - - - - - - -x


Thursday, July 18, 2019

Washington, D.C.



HEARING






REPORTED BY:

SABRINA K. BELL

In Re: Larry E. Klayman
July 18, 2019

| | |
|---|---|
| **Page 646** | **Page 648** |

**Page 646**

1        Hearing, taken at the Board on
2 Professional Responsibility, 430 E Street NW,
3 Washington, DC, Courtroom II, commencing at 1:30
4 p.m., before the Ad Hoc Hearing Committee, and
5 before Sabrina K. Bell, a court reporter and Notary
6 Public in and for the District of Columbia, when
7 were present on behalf of the respective parties:
8
9 APPEARANCES:
10      AD HOC HEARING COMMITTEE:
11      BUFFY J. MIMS, ESQUIRE
12      Chair
13      MS. ROBIN BELL
14      Public Member
15      CHRISTIAN WHITE, ESQUIRE
16      Attorney Member
17
18      On behalf of the DC Attorney Disciplinary
19      System:
20        JULIA L. PORTER, ESQUIRE
21        Deputy Disciplinary Counsel

**Page 648**

1          I N D E X
2 WITNESSES:        EXAMINATION
3 ERWIN CHEMERINSKY    645, 694, 698
4 LARRY E. KLAYMAN      700
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

| | |
|---|---|
| **Page 647** | **Page 649** |

**Page 647**

1 APPEARANCES CONTINUED:
2 ALSO PRESENT:
3      LARRY E. KLAYMAN, ESQUIRE
4      Respondent
5 and
6      OLIVER PEER, ESQUIRE
7      Assistant to Mr. Klayman
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 649**

1       P R O C E E D I N G S
2    CHAIRPERSON MIMS: Back on the record
3 at 12:34 on Thursday, July 18th.
4      You may get started, Mr. Klayman.
5    MR. KLAYMAN: Yes. We're going to be
6 starting with the testimony of Dean Erwin
7 Chemerinsky of the University of California,
8 Dean -- Boalt School of Law.
9      Dean Chemerinsky?
10      (Calling witness on telecom.)
11    MR. CHEMERINSKY: This is Dean
12 Chemerinsky. Hello?
13    MR. KLAYMAN: Yes. Dean Chemerinsky, this
14 is Larry Klayman. How are you?
15    MR. CHEMERINSKY: I'm well. I'm going to
16 put this on speaker because it's going to be
17 easier, but let me know if there's any problems.
18    MR. KLAYMAN: Okay.
19    MR. CHEMERINSKY: Can you hear me okay?
20    MR. KLAYMAN: Yes. We're about ready to
21 begin.
22    MR. CHEMERINSKY: I'm here if you can hear

2 (Pages 646 to 649)

In Re: Larry E. Klayman
July 18, 2019

Page 650

1 me okay.

2     MR. KLAYMAN: Yes, we can. Thank you.

3     CHAIRPERSON MIMS: Dean Chemerinsky, this

4 is Buffy Mims. I'm Chair of the Committee here.

5 We'll go ahead and get started here by swearing you

6 in, if that's okay?

7     MR. CHEMERINSKY: All right.

8     CHAIRPERSON MIMS: Can you go ahead and

9 state your full name for the record.

10     MR. CHEMERINSKY: Sure. Erwin, E-r-w-i-n,

11 Chemerinsky, C-h-e-m-e-r-i-n-s-k-y.

12     CHAIRPERSON MIMS: And do you go by

13 Dean Chemerinsky?

14     MR. CHEMERINSKY: Yes. That's my official

15 title, but whatever the Committee is comfortable

16 with is fine with me.

17 Whereupon,

18         ERWIN CHEMERINSKY

19 called as a witness by Disciplinary Counsel, and

20 after having been first duly sworn, was examined

21 and testified as follows:

22     DIRECT EXAMINATION

Page 651

1 BY MR. KLAYMAN:

2     Q. Dean Chemerinsky, it's Larry Klayman.

3 Thank you for appearing.

4     Would you please state your name and your

5 position at the University of California.

6     A. My name is Erwin Chemerinsky. And I'm the

7 dean and Jesse H. Choper Distinguished Professor of

8 Law at the University of California, Berkeley,

9 School of Law.

10     Q. And you have executed a declaration, which

11 is Respondent's Exhibit 21, which is in evidence.

12 I just --

13     MS. PORTER: Objection. I don't think it

14 is in evidence. I thought we had gone over this on

15 Tuesday that Mr. -- Dean Chemerinsky, excuse me,

16 was not going to be permitted to testify as to the

17 two matters in that declaration.

18     CHAIRPERSON MIMS: Well, I'm not sure it

19 is in evidence. Is it?

20     MR. KLAYMAN: Yeah, it is. It already is.

21     MS. PORTER: It has never been offered.

22     MR. KLAYMAN: Yes, it has.

Page 652

1     MS. PORTER: No, it has not.

2     MR. KLAYMAN: It was offered in our

3 exhibit book. It was not objected to. And we went

4 through that on Monday.

5     MS. PORTER: I'm sorry. The only

6 objections that were required prior to the hearing

7 were to authenticity. I objected -- well, as set

8 forth in our motion about remote testimony, we did

9 object, if Dean Chemerinsky was going to be asked

10 about the 6th Amendment issue because we -- it's

11 irrelevant to these proceedings.

12     Moreover, we also objected to him

13 testifying about whether or not Mr. Klayman was

14 truthful. And I believe we -- it's never been

15 offered. And we would object on those relevancy

16 grounds.

17     And I think we also discussed that at the

18 close of the hearing on Tuesday. So it's never

19 been offered in evidence. And when we --

20 Disciplinary Counsel has never been given the

21 opportunity to object if it is being offered, which

22 is why I'm standing up, because I do object.

Page 653

1     MR. KLAYMAN: She has a right to

2 cross-examine --

3     CHAIRPERSON MIMS: Before you respond to

4 that, I do believe he offered his binders into

5 evidence of exhibits.

6     MS. PORTER: No. That's not true because

7 I have objections to other documents as well.

8     CHAIRPERSON MIMS: Okay.

9     MR. KLAYMAN: No. That's not my

10 understanding. The record will show otherwise.

11     Anyway, Ms. Porter will get a chance to

12 cross-examine.

13     CHAIRPERSON MIMS: Okay. Well, let's --

14 now, let's deal with the facts that we did discuss

15 on Tuesday that the contents of what was in

16 Dean Chemerinsky's affidavit were irrelevant to

17 this proceeding.

18     We had a specific discussion that he was

19 going to testify as to what was on your witness

20 list. The description there, which related to the

21 reasonableness of the filings -- and I can get back

22 and read the sentence to you -- as well as

In Re: Larry E. Klayman
July 18, 2019

## Page 654

1  potentially the Bivens actions.
2      But I think we also made the qualification
3  that we would hear about his qualifications and
4  ability to be able to testify about those actions.
5      MR. KLAYMAN: Yes. And there's no --
6  there was nothing said about that he couldn't give
7  his opinion with regard to the findings of
8  Judge Gould. I'm not talking specifically about
9  the pro hac vice entry in terms of its -- should be
10  granted or not granted.
11      Although, I will proffer the declaration,
12  which expert Chemerinsky has filed under Rule 7.16,
13  regardless of Your Honor's ruling, one way or the
14  other. So I proffer it on the record.
15      But I would like him to be able to
16  testify. She can make a relevancy objections. And
17  we can decide these issues after he testifies.
18  It's not going to be a long testimony.
19      CHAIRPERSON MIMS: But what exactly in the
20  declaration are you attempting to illicit testimony
21  about?
22      MR. KLAYMAN: Well, specifically his

## Page 655

1  background, the fact that he's reviewed certain
2  exhibits as he states in paragraphs -- he agrees
3  with the analysis of Judge Gould, having reviewed
4  the pro hac vice applications that I answered that
5  -- which I was required to answer, that I didn't
6  make a misstatement based upon that application,
7  and that Judge Gould rulings -- he agrees with him
8  generally speaking.
9      And we set forth in the declaration
10  exactly the reasons for that and it was my
11  understanding that we're getting, Your Honor, in
12  all respect, sandbagged a little bit here because
13  this is in evidence right now.
14      She can make her relevancy objections.
15  And you can then decide ultimately when you do you
16  report and recommendation what's appropriate and
17  what's not.
18      But I'd like to be able to have Dean
19  Chemerinsky, who's testifying, taking his time,
20  he's very busy, to just authenticate his
21  declaration at this point. That's all I was trying
22  to do.

## Page 656

1      But with respect to Judge Gould's
2  opinions, his opinions are what they are. And we
3  will accept them, and we can review them if we
4  think they're relevant, but that's actually not
5  what we're here about today, is Judge Gould's
6  opinion.
7      How is Judge Gould's opinion relevant?
8      MR. KLAYMAN: Your Honor, yesterday, I
9  cited the rules that said there is a presumption
10  that we should be able to present expert testimony
11  as long as that testimony does not go to a opinion
12  as to whether or not I violated an ethical rule.
13  Okay? The law is very clear on that. I cited two
14  cases on that.
15      I don't understand why Counsel is trying
16  to prevent the Committee from getting a full
17  reading according to the cases that I put on the
18  record. Certainly, they can make relevancy -- she
19  can make relevancy objections, but we're here to
20  get the truth. And we're here to follow the law.
21      I have had in other proceedings expert
22  testimony submitted, for instance Professor

## Page 657

1  Rotunden (phonetic) and in other matters. And
2  there was never a problem in having it done. But
3  you will be able to weigh it once it comes in. And
4  you decide what you want to use and what you don't
5  want to use.
6      But in any event, under Rule 7.16 of the
7  Board, I can put it on the record anyway as a
8  proffer subject to the Board's review.
9      CHAIRPERSON MIMS: But you still haven't
10  answered my question. The question that's pending
11  is how is Judge Gould's opinion relevant to this
12  hearing?
13      MR. KLAYMAN: Because it's an expert who's
14  looking at it -- who's an expert on constitutional
15  law and professional ethics. And he's saying --
16  he's looking at this, too, and he's saying, I agree
17  with minority opinion here of Judge Gould. And I
18  analyzed it, too. And this is my expert opinion.
19  And that is crucial here because --
20      CHAIRPERSON MIMS: Whether or not Judge
21  Navarro granted your pro hac is not at issue here.
22      MR. KLAYMAN: That's not what I'm talking

4  (Pages 654 to 657)

In Re: Larry E. Klayman
July 18, 2019

Page 658

1  about. I'm talking about having looked at the pro
2  hac vice applications and determined, based upon
3  his expertise, that I did not have to answer
4  that -- which I did not have to answer it, and I
5  did not misrepresent with regard to matters which
6  are alleged.
7      And I should be able to put that on the
8  record. Professor Chemerinsky has limited time.
9  He's very busy. I don't mean to rush you or
10  anybody here, but can we deal with this at the end?
11  I'm able to put it on the record as to a proffer in
12  any event.
13      CHAIRPERSON MIMS: You can put on the
14  record the testimony that we discussed yesterday,
15  which relates to the reasonableness of the filings.
16  I thought we were very clear yesterday that that is
17  what his testimony was going to be.
18      MR. KLAYMAN: You know, there's the
19  rule -- yeah. There's the rule here that if you
20  don't object to the exhibits, that you waive your
21  objections regardless of what she filed before
22  which was premature to Ms. Porter.

Page 659

1      CHAIRPERSON MIMS: I'm not even talking
2  about her filings. When we had the discussion on
3  Tuesday, I specifically stated that nothing in his
4  affidavit was relevant.
5      MR. KLAYMAN: Well --
6      CHAIRPERSON MIMS: So if the --
7      MR. KLAYMAN: I don't --
8      CHAIRPERSON MIMS: -- testimony that he's
9  about to give relates to the reasonableness of the
10  filing --
11      MR. KLAYMAN: I don't recollect your
12  saying that the whole affidavit was not valid. We
13  didn't get into the substance of it on Tuesday.
14      And again, Your Honor, if I may reiterate,
15  I can make the proffer. I can put the testimony on
16  the record. I can put the declaration on the
17  record. The Board will be making the ultimate
18  decision here subject to appeal to the DC Court of
19  Appeals. So I'd like to put it on the record in
20  all due respect. I respect you. But that's the
21  rule. I can.
22      If you're excluding it, I can put it on

Page 660

1  there as a proffer. And Your Honor can decide,
2  with your Committee members, what to do with it
3  when you write your report and recommendation.
4      CHAIRPERSON MIMS: Here's the sentence
5  that I read into the record. "He will also testify
6  that the pleadings filed in other actions taken by
7  Mr. Klayman in his effort to obtain pro hac vice
8  admission, and to correct the judicial record were
9  reasonable as he had inter alia, the right to
10  correct false statements on the judicial record,
11  particularly, since they were being used against
12  him."
13      I read that statement on Tuesday and I
14  said that is what he could testify about.
15      MR. KLAYMAN: Yeah. And that's subsumes
16  the misstatements that are alleged for which Bar
17  counsel would like me disciplined. So it gets to
18  that issue -- false statements.
19      I was correcting the false statements of
20  Judge Bybee and Judge Fletcher, and I'm entitled to
21  get that testimony. But I'm also entitled to put
22  this declaration on the record because this Hearing

Page 661

1  Committee will be subject to review by the Board
2  and it should have that testimony if they disagree,
3  respectfully, with limiting the testimony.
4      I don't understand what Disciplinary
5  Counsel has to hide -- not hide, but what they're
6  worried about in getting the truth out. They
7  represent me as well as they represent the Office
8  of Disciplinary Counsel. I've never had an issue
9  in any of these cases in using expert testimony
10  before.
11      So, consequently, I would ask that
12  Professor Chemerinsky, who only has an hour here,
13  be able to testify as to these matters. And you
14  can then decide whether they're relevant,
15  irrelevant, or whatever.
16      CHAIRPERSON MIMS: He can testify as to
17  the matters that we've discussed on Tuesday. And I
18  don't want to rehash what has already been decided.
19  I mean, we were very clear. I don't think there
20  will be any danger of going outside the hour,
21  because it's a very limited scope.
22      And if the questions you're about to ask

In Re: Larry E. Klayman
July 18, 2019

Page 662

1  him relate to the statement I read or you want to
2  also illicit his qualifications to discuss the
3  Bivens filings, then that's what he can testify to.
4      MR. KLAYMAN: But I want to -- okay. But
5  I want that declaration in the record as a proffer
6  under Rule 7.16.
7      CHAIRPERSON MIMS: Well, let's put the
8  declaration aside because we'll take a break and
9  I'll decide if that can come in as a proffer.
10     But for right now, for his testimony,
11 we're not going to go back to the declaration,
12 unless, there is a paragraph in there that
13 specifically relates to -- or information in there
14 that relates to what I just read.
15     MR. KLAYMAN: Yes.
16     CHAIRPERSON MIMS: I remember it being
17 largely related to the 6th Amendment issue, which
18 we said we weren't going to discuss.
19     MR. KLAYMAN: Your Honor, that is
20 relevant, too. And I want to put this on the
21 record because -- and we can argue about it later.
22 But the fact that this was so clear cut that I

Page 663

1  should have the right to represent my client who
2  faced life imprisonment, and that Judge Bybee
3  writing majority opinions, would go outside of
4  those -- even the documents, and, in fact, become
5  and advocate for Judge Navarro, shows that it's
6  relevant as to whether those applications should
7  have been granted.
8      That shows the bias that I'm talking about
9  that caused him to write those orders. And --
10     CHAIRPERSON MIMS: If your argument is
11 that the 6th Amendment issue -- because those have
12 been implicated and Dean Chemerinsky is going to
13 testify that supported the reasonableness of your
14 filings, to that limited extent, it can come in.
15     MR. KLAYMAN: Okay. But I also want this
16 proffered on the record. And I have an absolute
17 right to have it on the record.
18     And it would be appealable error if it's
19 not on the record.
20     CHAIRPERSON MIMS: Let's address that
21 after his testimony.
22     MR. KLAYMAN: I'd like to get his

Page 664

1  testimony -- I'll get to those issues, but I want
2  to proffer his testimony on other issues as well as
3  a proffer.
4      CHAIRPERSON MIMS: You can make the
5  proffer, but after. Let's get his testimony done
6  since we know he only has an hour.
7      MR. KLAYMAN: Yes. But I want him to be
8  able to testify to those issues as a proffer.
9      CHAIRPERSON MIMS: Oh, I see.
10     MR. KLAYMAN: Yes.
11     MS. PORTER: Well, I guess I'm a little
12 bit confused because I thought we did resolve this
13 on Tuesday. And if he's being offered as an expert
14 in something other than 6th Amendment or
15 constitutional law, I'd also like to also be able
16 to voir dire him on his expertise, or, you know,
17 his qualifications to testify as an expert.
18     MR. KLAYMAN: I have no problem with that,
19 Your Honor. Unlike my esteemed co-counsel, I say
20 lay it all on the table and let people decide, not
21 restrict the analysis here. You deserve a full
22 record here.

Page 665

1      MS. PORTER: But I'd like a proffer as to
2  what he's being offered as an expert of that --
3      MR. KLAYMAN: I just went through it.
4  He's being offered regard to reviewing the pro hac
5  vice applications, looking at them, saying that I
6  didn't fail to disclose that, which I didn't have
7  to disclose, and that I didn't make
8  misrepresentations. And that, in addition to that,
9  because this was such a strong case for pro hac
10 vice entry that that, based on his opinion, colored
11 the thinking of Judge Bybee because of what he
12 wrote. It was just simply wrong.
13     And that is relevant. And he is not just
14 an expert on constitutional law and criminal
15 procedure, which he is. He's also an expert on
16 judicial ethics. And she's certainly able to
17 question him.
18     He is the dean of one of the most
19 prestigious law schools in this country. He has a
20 distinguished past. He deserves the opportunity to
21 be able to testify here. I'm going to ask him a
22 question, he's not -- I'm not paying anything to

6 (Pages 662 to 665)

In Re: Larry E. Klayman
July 18, 2019

## Page 666

1  testify. He's doing it because he thinks it's
2  right.
3       And, consequently, I think it's -- it's
4  not only inappropriate what Ms. Porter is trying to
5  do, I think it also doesn't pay the sufficient
6  degree of respect to Dean Chemerinsky. He deserves
7  to be able to testify. He's going to great effort
8  to do that.
9       CHAIRPERSON MIMS: I think I've heard the
10  decisions sufficiently. And I'm going to go back
11  to the original ruling on Tuesday to say he can
12  testify as to what he put in your witness list with
13  the sentence I read. We also discussed Bivens.
14       I think that you need to ask about his
15  background and his experience in order to put him
16  forward as an expert. We would like to hear that.
17       MR. KLAYMAN: I will do that.
18       CHAIRPERSON MIMS: And then to ask him
19  about the limited subject, which we already
20  discussed on Tuesday.
21       MR. KLAYMAN: Now, let me say --
22       CHAIRPERSON MIMS: But as it relates to

## Page 667

1  Judge Bybee, Judge Gould, and those issues, you
2  were overruled on that already.
3       MR. KLAYMAN: Let me -- I respectfully
4  disagree on that. I did not understand that.
5       (A short interruption re-calling the
6  witness.)
7       Yes. One other thing, Your Honor, is that
8  when Ms. Porter on behalf of Office of Disciplinary
9  Counsel filed after I had simply asked for remote
10  testimony statements opposing his testimony, Your
11  Honor said that we would take it up at the
12  appropriate time, which I understood to be as the
13  testimony is elicited. She can certainly make an
14  objection here.
15       But this is, in my view, should come in
16  for the truth of the matter as to the substance of
17  his declaration, but also as a proffer so the Board
18  can review it and decide what to do. And that's
19  important.
20       And I might add one other thing, is that
21  the only material witness in this case of any
22  substance is me. Office of Disciplinary Counsel

## Page 668

1  has no material substantiative witnesses other than
2  law clerks looking at documents. And it's very
3  important to me, particularly since Your Honor
4  denied discovery here, with regard to Judge Bybee
5  and others. And there's an issue involving, you
6  know, his familial relationships with others.
7  We're going on the basis of what he said, but I
8  have no way to get behind that.
9       Professor Chemerinsky is not being offered
10  for that. But I'm just saying is, is that it seems
11  like I've been excluded from defending my case.
12  And I deserve to be able to do a full defense. And
13  I don't mean that in any lack of respect to you
14  because, you know, I appreciate, you know, the way
15  you've administered to this. But I deserve to get
16  it on the record. And that's all I'm asking.
17       CHAIRPERSON MIMS: I understand your
18  argument. I did understand it on Tuesday when it
19  was made the first time. We do not need to go over
20  things that the Board considers -- that the Hearing
21  Committee considers irrelevant.
22       And, I think, right now, we're wasting

## Page 669

1  time going over this because --
2       MR. KLAYMAN: Well, okay, then --
3       CHAIRPERSON MIMS: -- I'm going to stick to
4  the ruling that was put forth on Tuesday.
5       MR. KLAYMAN: Well, that's fine, Your
6  Honor, but I also ask that we stick to Rule 7.16
7  and allow me to make a proffer. That's a Board
8  rule.
9       CHAIRPERSON MIMS: You're objection is
10  been noted.
11       MR. KLAYMAN: Okay. And I'm going to get
12  through this stuff that you suggest initially. And
13  then I'm going to make the proffer on the other
14  issues.
15       BY MR. KLAYMAN:
16       Q. Dean Chemerinsky, Respondent's Exhibit 21,
17  did you sign that document?
18       A. If this is the declaration, I did.
19       Q. Yes. And is it true and correct to the
20  best of your knowledge --
21       MS. PORTER: Objection.
22       CHAIRPERSON MIMS: He is going to -- he

7  (Pages 666 to 669)

In Re:  Larry E. Klayman
July 18, 2019

Page 670

1   can, at the end of his testimony, put in a proffer
2   as to what he would have testified with respect to
3   the declaration.
4          That is what I will allow you to do.
5   We're not going to elicit testimony from him.  He
6   can say that he signed the document.
7          When he's done testifying about what I've
8   already ruled is relevant to this hearing, okay --
9   when we're done with that testimony, you can then
10  put in a proffer as to what he would have
11  testified.  But we don't need to hear testimony
12  about it.
13         MR. KLAYMAN:  All I'm just doing is
14  authenticating, and then you can decide what the
15  testimony --
16         CHAIRPERSON MIMS:  You can authenticate
17  the document.
18         MR. KLAYMAN:  I am.
19         BY MR. KLAYMAN:
20    Q.  Is it true and correct to the best of your
21  knowledge -- the declaration?
22    A.  Yes.

Page 671

1    Q.  And you swore to it under oath?
2    A.  Yes.
3    Q.  Okay.  Professor -- Dean Chemerinsky,
4   would you please state for the Hearing Committee
5   your qualifications, your background, and your
6   expertise.
7    A.  As I said, I'm the dean of Law School and
8   a professor at University of California Berkeley
9   School of Law.  Before I came here, I was the
10  founding dean and Raymond Pryke Professor of First
11  Amendment Law at the University of California
12  Irvine School of Law for nine years.  Before that I
13  was the Alston & Bird Professor of Law and
14  Political Science at Duke Law School for four
15  years.  Before that I spent 20 years as a professor
16  at the University of Southern California, including
17  as the Sydney M. Irmes Professor of Public Interest
18  Law and Legal Ethics and Political Science.  I
19  teach in the areas of constitutional laws, federal
20  jurisdiction.  I've also for many years taught in
21  the area of professional responsibility.
22         CHAIRPERSON MIMS:  Dean, I just want to

Page 672

1   just give you a brief reminder that we have a court
2   reporter taking down everything that you say, and
3   you're talking rather quickly.
4          THE WITNESS:  I'm sorry.
5          CHAIRPERSON MIMS:  Yeah.  Thank you.
6          BY MR. KLAYMAN:
7    Q.  Now, you had an opportunity, did you not,
8   Dean Chemerinsky, to review Exhibits 1 --
9   Respondent Exhibit 1 and Respondent Exhibit 5 with
10  regard to the pro hac vice application that I had
11  submitted to Judge Gloria Navarro of the U.S.
12  District Court for the District of Nevada?
13         MS. PORTER:  I would object at this point
14  because I don't know what Mr. Dean Chemerinsky is
15  being offered as an expert in.
16         I understand the Chair's ruling about the
17  pro hac vice motion and the Bivens action, and I'd
18  like some, I guess, testimony or information about
19  his qualifications.  I understand he's an expert in
20  constitutional law, but these are two other issues.
21         What, if any, qualifications, experience,
22  or knowledge does he have about these issues that

Page 673

1   would qualify him for an expert?
2          So I object to his expert testimony on
3   this until he's qualified as an expert in these
4   areas.
5          CHAIRPERSON MIMS:  And which areas are
6   those?
7          MS. PORTER:  Well, my understanding is
8   that the Chair ruled that he could testify as to
9   the pro hac vice applications.  So what, if any,
10  expertise does he have with respect to federal pro
11  hac vice applications?
12         And, also, the Bivens actions.  What, if
13  any, expertise does he have with respect to Bivens
14  actions?
15         CHAIRPERSON MIMS:  I think that's fair.  I
16  think you should establish some qualifications.  I
17  think with the qualifications he's already put in
18  the record is probably subsumed with that, but you
19  can ask him a couple of specific questions as it
20  relates to the areas that we're about to get into.
21         BY MR. KLAYMAN:
22    Q.  Professor Chemerinsky, what membership and

In Re: Larry E. Klayman
July 18, 2019

Page 674

1  bars are you a member of?
2      A. I'm a member of the bar in the State of
3  Illinois since 1978. A member of the District of
4  Columbia bar since 1979. And then, a member of the
5  United States Supreme Court bar and the bar of
6  almost every federal court of appeals.
7      Q. Okay. And in addition to being a
8  distinguished professor and scholar, you have, from
9  time to time, yourself, submitted pro hac vice
10  applications in district courts?
11      A. That is correct.
12      Q. You're familiar with the procedure?
13      A. Yes, I am.
14      Q. Did I hear you correctly to say that
15  you're not only an expert with regard to
16  constitutional law, criminal law and procedure, but
17  that you also teach courses in professional
18  responsibility and ethics?
19      A. I taught professional responsibility most
20  most of the years that I was at the University of
21  Southern California Law School. I continued to
22  lecture on professional responsibility for students

Page 675

1  who were getting ready for the multi-state
2  professional responsibility exam.
3      MR. KLAYMAN: Okay. I therefore submit
4  that he's qualified as an expert in all three areas
5  that he just testified to.
6      MS. PORTER: May I ask some questions
7  before he's qualified as an expert?
8      CHAIRPERSON MIMS: Yes, go ahead.
9      BY MS. PORTER:
10      Q. Dean Chemerinsky, my name is Julia Porter,
11  and I represent the Office of Disciplinary Counsel
12  in this matter. Can you hear me okay?
13      A. I can.
14      Q. Other than filling out your own
15  applications for pro hac vice admission, what, if
16  any other, I guess, knowledge or experience have
17  that you had with pro hac vice applications, and, I
18  guess, dealing with specifically with the federal
19  courts?
20      A. I'm familiar with the case law concerning
21  when pro hac vice status should be granted. And I
22  have, as was pointed out, applied for it myself and

Page 676

1  it has always been granted, but that's the extent
2  of my knowledge of pro hac vice.
3      Q. With respect -- I don't think Mr. Klayman
4  even asked you about Bivens actions.
5      A. There I do have more expertise. I've been
6  teaching the course on federal courts since 1982,
7  and have done it most years since 1982 and covered
8  Bivens as a part of that. Also, I've written
9  extensively on Bivens. I have a treatise on
10  federal jurisdiction and chapter nine is about
11  Bivens actions. I've also litigated a number of
12  Bivens actions myself, most importantly, I think a
13  key circuit case on Bivens is Plaim v. Cheney,
14  which I argued in both the District Court and the
15  Circuit, but I've also handled other Bivens actions
16  as a lawyer.
17      MS. PORTER: Okay. Thank you.
18
19
20
21
22

Page 677

1      CHAIRPERSON MIMS: Dean Chemerinsky, this
2  is Ms. Mims again, the Hearing Committee Chair. I
3  have just a few follow-up questions.
4      BY HEARING CHAIR MIMS:
5      Q. You mentioned that you have been teaching
6  on federal courts. Does that include a federal
7  court's procedure?
8      A. Yes. Law schools, as you know, have a
9  course. Sometimes it's called "federal court."
10  Sometimes it's called "federal jurisdiction." And
11  I've taught that course most years since 1982. I
12  taught at DuPaul. I taught it at USC. I taught it
13  at Duke. And I caught it at Irvine. And I have a
14  treatise titled "Federal Jurisdiction," and it
15  parallels what is covered in the course.
16      HEARING CHAIR MIMS: Thank you.
17      BY MR. KLAYMAN (Resuming):
18      Q. I also understand, based on your
19  declaration, that you've authored 12 books, including
20  case books and treatises about Constitutional law,
21  criminal, procedural, and federal jurisdiction. Am I
22  right?

9 (Pages 674 to 677)

In Re: Larry E. Klayman
July 18, 2019

## Page 678

1    A    That's correct.
2    Q    Okay. Now you've had an opportunity to
3  review, did you not, Respondent's Exhibit 1 and 5,
4  which were the original pro hoc vice application to
5  Judge Navaro and the U.S. District Court for the
6  District of Nevada, and the supplemental filing which
7  is Respondent's Exhibit 5, when she asked certain
8  questions. And based upon your review of that, do
9  you have an opinion as to whether I answered all the
10  questions that I was required to answer truthfully?
11      MS. PORTER: Objection. That goes to the
12  ultimate question for this Hearing Committee.
13      MR. KLAYMAN: I'm not asking him to make
14  an ethical determination. I'm just asking him, based
15  upon his review and his expertise, with regard to
16  federal procedure and pro hoc vice applications,
17  whether he came to the same conclusion as Judge Gould
18  did when he reviewed that. And that's in the
19  declaration.
20      MS. PORTER: Well first, I would object to
21  that being Judge Gould's finding. But, second, the
22  question was: Was I, the Claimant, truthful? That

## Page 679

1  is no an appropriate question. I mean, I understand
2  Dean Chemerinsky's expertise in Constitutional law,
3  but that is a question about whether someone is being
4  candid or truthful with the court.
5      MR. KLAYMAN: Your Honor, I'm just simply
6  asking whether, based upon his review of the
7  applications, I answered those questions which I was
8  required to answer and did not need to go beyond
9  that. That's my question.
10      CHAIRPERSON MIMS: We are here. The
11  objection is sustained. You cannot ask him a
12  question that goes to the ultimate issue in this
13  matter. He is permitted to testify as to whether
14  your filings were reasonable, including the Bivens
15  actions, and so that's what we need to focus on.
16      MR. KLAYMAN: Well I didn't file the
17  Bivens action, Your Honor. Okay, despite the fact
18  that Ms. Porter tried to create that impression with
19  the way she phrases questions--
20      CHAIRPERSON MIMS: I misspoke.
21      MR. KLAYMAN: --which is quite, for lack
22  of a better word, dishonest. I never filed that

## Page 680

1  action. And consequently I should be able to ask the
2  question as to whether, based upon his review, I did
3  that which I was required to answer. I'm not asking
4  him to make an ultimate ethical decision as to
5  whether I violated any ethical rule. I'm not. I
6  should be able to ask him that. So to the extent
7  that Your Honor thinks that that was your ruling--and
8  I disagree--I would ask for reconsideration of that
9  and allow the record to be complete here.
10      What is the point of limiting his
11  testimony when you're going to get to rule it's
12  relevant or not?
13      CHAIRPERSON MIMS: Repeat the question
14  again for me, in a way that does not ask him a
15  question on what the Committee is here ultimately to
16  decide.
17      MR. KLAYMAN: I didn't ask him that.
18      CHAIRPERSON MIMS: Okay.
19      MR. KLAYMAN: What I asked him was, based
20  upon your review of the pro hoc vice applications,
21  Exhibit 1 and 5, Respondent's Exhibits 1 and 5, and
22  your experience and expertise in pro hoc vice and

## Page 681

1  federal procedure, did I answer all the questions
2  that I was required to answer by those applications.
3      CHAIRPERSON MIMS: He's not asking him
4  about the truthfulness of it. I'm going to allow him
5  to answer.
6      WITNESS CHEMERINSKY: Yes.
7      BY MR. KLAYMAN:
8    Q    As a general rule, and Judge Gould's
9  decision subsumed this, do you agree with the
10  dissenting opinions of Judge Gould with regard to my
11  pro hoc vice application?
12      MS. PORTER: Objection.
13      CHAIRPERSON MIMS: Sustained.
14      MR. KLAYMAN: Can I proffer here?
15      CHAIRPERSON MIMS: Are you done asking him
16  about every other--the issue that we're here to ask
17  him about? My ruling was, let's get through his
18  testimony that I've already ruled was relevant. And
19  then if you want to make a proffer as to what I've
20  already overruled, we can make a proffer so that you
21  have that on the record.
22      MR. KLAYMAN: As long as he's here, I'm

In Re:  Larry E. Klayman
July 18, 2019

Page 682

1  entitled under Rule 7.16 to put his testimony on the
2  record.  That's an absolute rule by the Board.
3      CHAIRPERSON MIMS:  I'll repeat myself.
4  Let's get through what I've ruled he can testify is
5  relevant.  And that relates to the reasonableness of
6  the filings, as well as the Bivens actions.  And
7  then we can quickly go through what you would like to
8  proffer into the record.  But I want to get through
9  what we've already ruled is relevant, first.
10     BY MR. KLAYMAN (Resuming):
11     Q    Now, Professor Chemerinsky, with regard
12  to judges, in your expert opinion are judges above
13  the law?
14     A    No, of course not.
15     Q    And is it not the case that judges can
16  be--actions can be brought with regard to injunctive
17  relief in certain situations with regard to judges?
18     A    I'll take your question literally.  In
19  certain situations, it can be.  But generally judges
20  cannot be sued for money or for injunctive relief.
21     A    But there are cases, for instance Hagan
22  versus Coggins, Action No. FW990878 2000, U.S.

Page 683

1  District Lexus, 22-062-11, Northern District of
2  Texas, April 26, 2000, the year 2000, where in a head
3  note it says:  The Hagan court allowed a Bivens
4  plaintiff leave to amend regarding plaintiff's claim
5  that Judge Buckmeyer, B-U-C-K-M-E-Y-E-R, denied Judge
6  Lindsay, L-I-N-D-S-A-Y, access to investigative
7  reports prepared by the FBI that substantiate
8  plaintiff's claims against Coggins and Scott.  The
9  court ordered an amended complaint with more
10  specificity, but did not deny it as a matter of law.
11     So is it fair to say that some
12  practitioners and experts believe that a Bivens
13  action with regard to injunctive relief, at a
14  minimum, is colorable, is sustainable?
15     A    Might it help the panel if I explain my
16  views on this a bit?  I think it would be difficult
17  to answer it 'yes' or 'no.'  I can do so in just a
18  few sentences, if it's acceptable to the panel.
19     CHAIRPERSON MIMS:  Yes, go ahead.
20     WITNESS CHEMERINSKY:  The Supreme Court
21  has said that judges have absolute immunity in civil
22  suits for money damages for their judicial tasks, but

Page 684

1  not immunity for their administrative tasks.
2      The Supreme Court in Employer versus Allen
3  then said judges do not have immunity to sue for
4  injunctive relief.  Congress amended Section 1983 in
5  the Judicial Improvements Act of 1996 to say that
6  judges cannot be sued for injunctive relief unless
7  there's an absence of declaratory relief where
8  they're violating a declaratory judgment.
9      So in answering your question, can there
10  ever be suits against injunction, the literal answer
11  is:  Yes, but it's quite restricted.  In answer to
12  the case, you say there are some cases that are
13  allowed injunctive suits against judges, but
14  generally judges can't be sued for money or for an
15  injunction.
16     I hope that elaboration of the law is
17  useful.
18     Q    Based upon your experience, since we live
19  in a common law system where law is being made all
20  the time, and the practitioner in this case, Mr. Joel
21  Hanson--because I didn't file the complaint--can he
22  assert a colorable claim for injunctive relief with

Page 685

1  regard to judicial violation of Constitutional
2  rights?  Is that something that he should be
3  sanctioned for doing?
4      MS. PORTER:  Objection.  I mean, I don't
5  understand the sanctions issue, and how Dean
6  Chemerinsky, with all due respect, has any expertise
7  in that.
8      MR. KLAYMAN:  He does have expertise, and
9  I would ask that he respond.
10     CHAIRPERSON MIMS:  I actually don't
11  understand the question.
12     BY MR. KLAYMAN (Resuming):
13     Q    The question is:  In our system of
14  justice, Dean Chemerinsky, is it not true that law is
15  made case by case, generally speaking?
16     A    Yes.
17     Q    And you can test the limits of the
18  common law by filing various legal proceedings?
19  That's the way it works in our system?
20     A    Yes.
21     Q    And that given what you've just
22  testified to, a lawyer can attempt to expand on the

11  (Pages 682 to 685)

In Re: Larry E. Klayman
July 18, 2019

Page 686

1  law by filing legal proceedings, in a case-by-case
2  analysis?
3      A    Yes, within the constraints of the rules
4  of ethics.
5      Q    Now in the documents that you reviewed,
6  did you see anywhere that Mr. Hanson was sanctioned
7  by Judge Navaro or the Ninth Circuit for filing a
8  Bivens action?
9      A    I did not focus on that in my reading of
10 the documents.  That was not the scope of the
11 declaration that I did.
12     Q    Okay.  Based upon your expertise and your
13 experience, in a case such as the Bundy case--well,
14 let me back up.  Are you aware of the context of the
15 Bundy case, the criminal prosecution in Las Vegas?
16     A    Yes.
17     Q    How did you become aware of that?  The
18 context?  How did you become aware of the nature of
19 the Bundy case in Las Vegas?
20     A    How did I become aware?
21     Q    Yes.
22     A    I'm having trouble hearing.

Page 687

1      Q    How did you become aware of the nature of
2  the prosecution of Cliven Bundy, his sons, and 14
3  other defendants in Las Vegas, Nevada?
4      A    I became aware primarily from media
5  accounts.  Also, a friend of mine was one of the
6  defense lawyers from the Federal Defenders Office,
7  and so I hear some of it from her.
8      Q    What's her name?
9      A    Brenda Wessler.  She's now a magistrate
10 judge in the District of Nevada.
11     Q    Now you are aware that in that case
12 there were 17 or so counts of criminal conduct
13 against the defendant?
14     A    Yes.
15     Q    And that my client, Cliven Bundy, faced
16 the prospect of life imprisonment for those 17
17 counts?  He's 71 years old at the time.
18         CHAIRPERSON MIMS:  Mr. Klayman, I think
19 you need to make sure you're leaning into the
20 microphone.
21         BY MR. KLAYMAN (Resuming):
22     Q    Could you hear me, Dean Chemerinsky?

Page 688

1      AIt was going in and out, I'm sorry.
2      Q    Yeah, your general knowledge is that
3  there were many counts, 17 to be precise, of
4  criminal charges against my client, Cliven Bundy, and
5  others in that case?
6      A    Yes, I was aware of that.
7      Q    And that if Cliven Bundy had been
8  convicted, along with the others, he could face a
9  sentence of life imprisonment?
10     A    Yes, I was aware of that.
11     Q    And based on your expertise, under those
12 circumstances is a lawyer--is a strong lawyer
13 necessary against this kind of a prosecution to
14 zealously represent his client?
15     A    Of course.
16     Q    Based on your experience, are there
17 lawyers that you've been in contact with, or
18 litigated cases with, who have been sanctioned by
19 judges for strong actions vis-a-vis the judge?
20     A    Yes.
21     Q    And with regard to what you know about
22 the Bundy case, just what you know, do you know of

Page 689

1  any such sanctions having been issued in that case?
2  Or with regard to my pro hoc vice application?
3      A    I do not know sanctions with regard to
4  your pro hoc vice application.  I do know what the
5  ultimate disposition of it was based on the judge's
6  termination of prosecutorial misconduct.
7      Q    That was why the superceding indictment
8  was dismissed?
9      A    Yes.
10     Q    Now given the dismissal of the
11 supercedious indictment, should the orders that you
12 reviewed of the Ninth Circuit and the underlying
13 orders of Judge Navaro, based on your expert opinion,
14 be vacated as moot, as Judge Gould ruled in this
15 case?
16         MS. PORTER:  Objection.  I mean, Dean
17 Chemerinsky may have his views, but it's the court
18 that gets to decide these things.  And whether or not
19 he agrees with Judge Gould on this issue or other
20 issues is really not relevant.
21         MR. KLAYMAN:  He can give his expert
22 opinion.

12 (Pages 686 to 689)

In Re: Larry E. Klayman
July 18, 2019

Page 690

1  CHAIRPERSON MIMS: We have gone over this.
2  The objection is sustained. But do you mind if I ask
3  a few questions? I don't want to interrupt your
4  statement--
5  MR. KLAYMAN: Sure.
6  CHAIRPERSON MIMS: --but I know we're
7  running out of time with him.
8  BY CHAIRPERSON MIMS:
9  Q  Dean Chemerinsky, have you reviewed, I
10 believe there were five writs of mandamus filed in
11 this action. Have you reviewed those writs?
12 A  Yes, I have.
13 Q  In your practice of teaching about
14 federal courts, have you seen writs like this
15 previously?
16 A  I've certainly seen lawyers try to get
17 review of trial courts vis writs of mandamus, and so
18 I think the answer to your question have I seen
19 writs of mandamus as a way of reviewing district
20 court decisions, the answer would be yes.
21 Q  From your experience in teaching and
22 reviewing, you know, attorneys filing writs like

Page 691

1  this, did you--do you have an opinion as to whether
2  the filing of these five writs, either individually
3  or in total, was reasonable?
4  A  Yes, I do. I think that it was
5  reasonable under the circumstances of this case.
6  Q  Why?
7  A  This is about the ability of a criminal
8  defendant to have counsel of choice; that the
9  district court had refused to allow the pro hoc vice
10 status; and the defendant wanted to have Mr. Klayman
11 represent him. And the only way of having the
12 district court decision reviewed was through these
13 writs of mandamus.
14 CHAIRPERSON MIMS: Thank you. I may have
15 one or two more follow-ups, but I'm going to let Mr.
16 Klayman finish.
17 Do you have a hard stop in ten minutes?
18 WITNESS CHEMERINSKY: I can probably
19 extend it about 10 minutes. Beyond that, I have a
20 speaking engagement in San Francisco that I have to
21 get to. But I can probably go another 20 minutes, if
22 that's okay with you.

Page 692

1  CHAIRPERSON MIMS: That's fine. I just
2  want to make sure that we give Bar Counsel enough
3  time to question you, as well.
4  And, Mr. Klayman, I think to be fair,
5  we're going to let you ask a few more questions. Why
6  don't you go about five more minutes, but we do have
7  to give Ms. Porter time to ask questions, as well.
8  BY MR. KLAYMAN (Resuming):
9  Q  In reviewing the court's orders, your
10 honor--excuse me, Dean Chemerinsky--and you are
11 "your honor" as well--judged by the majority of the
12 opinions which you wrote, is it your opinion that he
13 went beyond that which he should have in analyzing
14 whether or not my pro hoc vice should be granted? In
15 other words, did he become an advocate for Judge
16 Navaro? That's what I'm asking, the essence of it.
17 MS. PORTER: Objection.
18 CHAIRPERSON MIMS: Sustained.
19 (Pause.)
20 CHAIRPERSON MIMS: Mr. Klayman?
21 BY MR. KLAYMAN (Resuming):
22 Q  Did you hear the question?

Page 693

1  A  Yes, sir.
2  CHAIRPERSON MIMS: Yes, but the objection
3  is sustained. We need to move on.
4  MR. KLAYMAN: Oh, I'm sorry. I'm sorry.
5  BY MR. KLAYMAN (Resuming):
6  Q  Now, Professor Chemerinsky, have I paid
7  you any remuneration for your testimony now, or has
8  that been promised in the future?
9  A  No, I have not been paid and will not
10 take any payment for this testimony.
11 Q  I want to ask a factual question, not as
12 an expert but as a factual question. Have you ever
13 had any experience with a judge called William D.
14 Keller?
15 A  Not personally, no. I never appeared in
16 front of him.
17 Q  Do you know of his reputation?
18 MS. PORTER: Objection.
19 CHAIRPERSON MIMS: I don't see how this is
20 relevant, Mr. Klayman.
21 MR. KLAYMAN: That's fine. No further
22 questions. I reserve the right to redirect.

13 (Pages 690 to 693)

In Re: Larry E. Klayman
July 18, 2019

Page 694

1  CHAIRPERSON MIMS: Ms. Porter?
2  MR. KLAYMAN: Let me say one other thing.
3  Your Honor, I do ask that the declaration, whatever
4  Your Honor ultimately rules is relevant or not, be
5  placed on the record as a proffer, at a minimum,
6  under Rule 7.16. That is Dean Chemerinsky's
7  declaration.
8  CHAIRPERSON MIMS: Ms. Porter?
9  BAR COUNSEL EXAMINATION
10  BY MS. PORTER:
11  Q  Good afternoon, Dean Chemerinsky. My
12  name, again, is Julia Porter. I just have a few
13  questions. I think you've testified that judges,
14  acting in their judicial capacity, have absolute
15  immunity for a Bivens action. Is that correct?
16  MR. KLAYMAN: Objection.
17  WITNESS CHEMERINSKY: That's right.
18  Judges in the judicial capacity cannot be sued for
19  money damages, whether it's through Bivens if it's a
20  federal judge, or if it's a state judge through
21  Section 1983.
22  BY MS. PORTER (Resuming):

Page 695

1  Q  And that's very well established even by
2  Supreme Court precedent?
3  A  Yes. The Supreme Court in Stump versus
4  Sparkman in 1980 said that judges have absolute
5  immunity for their judicial tasks.
6  Q  And as a federal district court, and even
7  as the Ninth Circuit, you're required to follow the
8  Supreme Court's ruling on those matters? Is that
9  correct?
10  A  Yes.
11  Q  Presidents also have absolute immunity
12  in Bivens actions. Isn't that correct?
13  A  A President cannot be sued for money
14  damages for anything done in carrying out the
15  presidency. That's Nixon versus Fitzgerald, 1982.
16  There have been no follow up cases in terms of the
17  scope of that. And the lower courts have said
18  Presidents can be sued for injunctive relief.
19  Q  With respect to Bivens action, would you
20  agree that it would be unwarranted to file a Bivens
21  action against a judge for denying a pro hoc vice
22  application?

Page 696

1  MR. KLAYMAN: Objection. Lacks
2  foundation, and she's getting into the same areas
3  that you objected--
4  MS. PORTER: I'm asking a hypothetical
5  question of an expert.
6  MR. KLAYMAN: It's not a hypothetical.
7  Besides, I didn't sign it, but it's not a
8  hypothetical.
9  CHAIRPERSON MIMS: I'm going to sustain
10  the objection.
11  BY MS. PORTER (Resuming):
12  Q  One more question, Dean Chemerinsky.
13  Would you agree that, even though a client
14  hypothetically is entitled to, or has a Sixth
15  Amendment right to counsel of choice, that would not
16  permit the counsel to make false or misleading
17  representations to the court?
18  MR. KLAYMAN: She's doing exactly what she
19  kept me from doing. She's asking for an opinion on
20  an ethics violation of the Rules of Professional
21  Responsibility.
22  CHAIRPERSON MIMS: But she's not asking

Page 697

1  about anything specific in the record. And we did
2  allow, to some extent, his testimony about the right
3  to counsel. And he gave general opinions on that,
4  so--
5  MR. KLAYMAN: What's the question?
6  MS. PORTER: Do you want me to restate it?
7  CHAIRPERSON MIMS: Repeat the question.
8  BY MS. PORTER (Resuming):
9  Q  Dean Chemerinsky, would you agree that
10  with respect to a criminal defendant's Sixth
11  Amendment right to counsel, that would not permit a
12  lawyer who is seeking admission as the defendant's
13  counsel to make false or misleading statements to the
14  court?
15  A  Yes, I would agree with that.
16  MR. KLAYMAN: Objection.
17  CHAIRPERSON MIMS: Overruled.
18  BY MS. PORTER (Resuming):
19  Q  Could you restate your answer, please,
20  just so that the court reporter gets it?
21  A  Yes, I would agree.
22  MS. PORTER: I have no more questions.

14  (Pages 694 to 697)

In Re: Larry E. Klayman
July 18, 2019

## Page 698

1  Thank you.
2        FURTHER EXAMINATION
3        BY MR. KLAYMAN:
4     Q   Based upon your understanding of the
5  Bundy prosecution, is it your expert opinion that
6  Judge Navaro violated the Constitutional rights of
7  Cliven Bundy and the defendants?
8        MS. PORTER: Objection.
9        CHAIRPERSON MIMS: Sustained.
10        MR. KLAYMAN: No further questions. I'd
11  like him to proffer an answer.
12        CHAIRPERSON MIMS: If you want to do a
13  proffer right now and read into the record what you
14  would have had him testify about, and he can agree
15  that that would have been his testimony had it not
16  been overruled by the Committee, then why don't you
17  go ahead and do that.
18        BY MR. KLAYMAN:
19     Q   Thank you. And I'm referring to your
20  declaration, Dean Chemerinsky, Exhibit 21. If you
21  had been permitted to testify fully, would you have
22  testified as to the matters that you set forth at

## Page 699

1  pages 1, 2, 3, 4, and 5 of your declaration?
2     A   Yes.
3     Q   And did you set forth there, based on
4  your knowledge and belief and expertise, is true and
5  correct?
6     A   Yes.
7        MR. KLAYMAN: No further questions.
8        CHAIRPERSON MIMS: Thank you so much,
9  Dean. I know you are a very busy person, and we
10  appreciate your coming in to help out on this matter.
11        WITNESS CHEMERINSKY: It's my pleasure.
12  Thank you for listening to me.
13        CHAIRPERSON MIMS: Thank you.
14        MR. KLAYMAN: Thank you.
15        CHAIRPERSON MIMS: Does that conclude your
16  witnesses, Mr. Klayman?
17        MR. KLAYMAN: No, I just need to finish.
18  We left my testimony open yesterday to add some
19  exhibits.
20        CHAIRPERSON MIMS: With respect to the
21  supplemental exhibits?
22        MR. KLAYMAN: Yes.

## Page 700

1        CHAIRPERSON MIMS: Okay, I'll allow that.
2        You filed--did you file three exhibits?
3  Three additional exhibits? Are they all included
4  within this binder here, Mr. Klayman?
5        MR. KLAYMAN: No, the binder is dealing
6  with the case in the Northern District of California.
7  This is reference. And 2 and 3 are matters that
8  concern my direct and cross-examination. They are
9  actually in the back of--
10        CHAIRPERSON MIMS: They are? Thank you.
11        COMMITTEE MEMBER WHITE: Mr. Klayman, with
12  regard to--
13        CHAIRPERSON MIMS: Mr. Klayman, you
14  understand that you are still under oath as you were
15  on Tuesday?
16        MR. KLAYMAN: Yes, thank you.
17        CHAIRPERSON MIMS: Thank you.
18        COMMITTEE MEMBER WHITE: With regard to
19  Respondent's Exhibit No. 1, Supplemental Exhibit No.
20  1, what are those documents?
21        MR. KLAYMAN: They are documents that
22  provide a larger record of what had been--what I've

## Page 701

1  been questioned about by Ms. Porter, dealing with a
2  case that was brought in the U.S. District Court for
3  the Northern District of California, that was
4  assigned to Judge Wilken. And they concern an attack
5  by ANTIFA, who has become rather notorious over the
6  years, against a gay woman, a gay conservative woman
7  who went to hear a speech of Milo Yanapolois--if I'm
8  pronouncing his name correctly--and she was attacked
9  by members of the ANTIFA. And she was thrown to the
10  ground, and she was assaulted.
11        And the first lawsuit that I filed is
12  contained at pages 1 through, excuse me, Bates
13  numbers are RSX-001 through and including RSX-0040.
14  And that was filed in the Northern District.
15        Now the complaint ultimately was dismissed
16  without prejudice, voluntarily dismissed, and that is
17  at RSX-0041. A new case was filed in a complaint in
18  the U.S. District Court of the Northern District of
19  California in the San Francisco Division. And the
20  mix of the defendants is different than in the first
21  case. It centers primarily around the activities of
22  ANTIFA. So there are many fewer defendants. And

15 (Pages 698 to 701)

# EXHIBIT D

In Re:  Larry E. Klayman
July 18, 2019

Page 806

1  Cliven Bundy, who thankfully no one else will
2  represent unless someone like Larry Klayman comes
3  in.
4          There are other lawyers who have done this
5  in the past, with different political stripes --
6  Ralph Nader, who actually I know, counselor, others,
7  you need lawyers like that.  You don't want to remove
8  them from the practice of law because then you leave
9  criminal Defendants and civil litigants at the mercy
10  of the big powers, the rich and the powerful who want
11  to and will use their power to try to destroy them,
12  thank you.
13          CHAIRPERSON MIMS:  Any response, Miss
14  Porter?
15          MS. PORTER:  No.
16          CHAIRPERSON MIMS:  Alright, why don't we
17  take a break.  I would say come back and wait for us
18  in 20 minutes.  I don't know that we'll be done in 20
19  minutes.  It may be longer.  If you want to take a
20  longer break, we can say a half an hour, a half an
21  hour?  Let's reconvene at a half an hour, and if
22  we're not back in a half an hour it means that we're

Page 807

1  not ready yet, so just try and hang around closely to
2  the courtroom.
3          We're off the record at 3:57, thank you.
4          (Off the record 3:57.)
5          (On the record 5:22.)
6          CHAIRMAN MIMS:  Alright, we're back on
7  the record at 5:22.  So, the Hearing Committee has
8  been unable to reach a non-binding determination.
9  So, at this point we're going to have to set a
10  briefing schedule.
11          Before we do that, I do want to talk a
12  little bit about what we'd like to see in the briefs
13  in some of the areas that -- of why we're unable to
14  come to an agreement and find a violation.
15          It's a clear and convincing case, so for
16  the statements and let's start with the pro hac
17  motion.  For the statements, for the omissions or the
18  misleading things that you found in there where you
19  believe that there are violations, we would like you
20  to be very specific about those.
21          I know that in your closings you did go
22  through a number of examples.  I mean we've gone

Page 808

1  through the misrepresentation of Mr. Whipple's
2  experience.  Mr. Klayman's misrepresentation or
3  misleading of his own criminal experience.  The issue
4  of not disclosing the Hearing Committee report, and
5  addressing his arguments that it wasn't final, that
6  it was an ongoing matter and also that the
7  affidavits, the sworn testimony that he had violated
8  a rule, that that had been withdrawn.
9          Accusing Judge Navarro of being malicious
10  and corrupt.  For each of these items -- we need you
11  to specifically spell out how that rises to the level
12  of clear and convincing.  And on the same token, Mr.
13  Klayman, we need -- what I'd like you to do is for
14  your statement of facts, listed out in paragraph
15  form, so that Mr. Klayman can either admit it or
16  deny it.
17          And Mr. Klayman, we need you to respond
18  specifically to the statements in the brief.  I
19  understand that you may think that there is a big
20  issue with 6th Amendment in here, we don't really see
21  that.  There may be a very limited case in which you
22  might bring that up, but I doubt it's going to be

Page 809

1  much.
2          And bar counsel's brief, the extent that
3  it's in your response I think can be pretty limited.
4  I mean you've made your points on the 6th Amendment
5  issue and the constitutionality issues.  We've heard
6  them.  I think the relevance is probably limited in
7  terms of your advocacy of the issue, and so I really
8  need you to respond so that the Committee can sift
9  through all of this.
10          Respond to her points in the brief.  You
11  admit it, or you deny it.  And if you deny whatever
12  fact it is, give us a specific reason of why you deny
13  it.  Okay.  So, the timing is generally 10 days
14  after the transcript comes in, and as I understand it
15  the transcript comes in in two weeks.
16          MR. KLAYMAN:  Your Honor, may I address
17  you on that?
18          CHAIRPERSON MIMS:  Yes.
19          MR. KLAYMAN:  If we may have additional
20  time, my wife is pregnant and will be giving birth
21  around this time period.
22          CHAIRPERSON MIMS:  Okay, when is --

42  (Pages 806 to 809)

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
AD HOC HEARING COMMITTEE



FILED

August 8, 2019

Board on Professional
Responsibility

In the Matter of                          :
                                          :
    LARRY E. KLAYMAN,                      :
                                          :       Board Docket No. 18-BD-070
Respondent.                                :       Disc. Docket No. 2017-D051
                                          :
A Member of the Bar of the                 :
District of Columbia Court of Appeals:     :
(Bar Registration Number: 334581)          :

## ORDER

A hearing was held in this matter on July 15 – 16 and July 18, 2019 before
Buffy J. Mims, Esquire, Chair of the Ad Hoc Hearing Committee; Dr. Robin J. Bell,
Public Member; and Christian S. White, Esquire, Attorney Member.    Deputy
Disciplinary Counsel Julia Porter, Esquire, represented the Office of Disciplinary
Counsel and Respondent appeared *pro se*. Following the conclusion of the
evidentiary portion of the hearing and the parties' respective closing arguments, the
Hearing Committee went into executive session and determined that it could not
make a preliminary finding that Disciplinary Counsel had proven any disciplinary
rule violation. This order sets forth the post-hearing briefing schedule.

As a preliminary matter, the parties' List of Exhibits forms appear not to have
been filed with the Board office.  Thus, the parties are directed to review each other's
List of Exhibits Form and note on such Forms those exhibits that were admitted

during the hearing.   The parties shall file their respective forms on or before **August 12, 2019**.

The parties are directed to file proposed findings of fact and conclusions of law according to the following schedule:  Disciplinary Counsel's opening brief is due on or before **August 26, 2019;** Respondent's response brief is due on or before **September 18, 2019**; and Disciplinary Counsel's reply brief is due on or before **September 30, 2019**.  Respondent shall not file a responsive document without leave of the Chair.

Disciplinary Counsel's opening brief shall contain proposed findings of fact that shall consist of numbered paragraphs, including within each paragraph specific references to the parts of the record that support the facts set forth in that paragraph. Respondent's brief shall contain a response to each numbered paragraph in Disciplinary Counsel's proposed findings of fact, including, in the case of any disagreement, specific references to the parts of the record relied upon. Respondent's proposed findings of fact shall consist of numbered paragraphs, including within each paragraph specific references to the parts of the record relied upon.  If Respondent proposes additional findings of fact, Disciplinary Counsel's reply shall contain a response to each numbered paragraph in Respondent's proposed findings of fact, including, in the case of any disagreement, specific references to the parts of the record relied upon.

In addition to filing hard four copies of each submission with the Office of the Executive Attorney, as required by Board Rule 12.1(b), each party shall also submit an electronic copy of the word processing file used to produce each brief, by filing a cd-rom or flash drive with the Office of the Executive Attorney, or by emailing the word processing file to the Board's Case Manager, Meghan Borrazas at CaseManager@dcbpr.org.

The Office of the Executive Attorney is directed to serve a copy of this Order by email and U.S. Mail.

It is so Ordered.

AD HOC HEARING COMMITTEE

By: _____
Buffy J. Mims
Chair

cc:

Larry E. Klayman
2020 Pennsylvania Avenue
#800
Washington, D.C. 20006

And to:

269 South Beverly Drive
Suite 1298
Beverly Hills, California 90212
leklayman@gmail.com

3

Julia L. Porter, Esquire
Senior Assistant Disciplinary Counsel
Office of Disciplinary Counsel
515 5th Street, N.W.
Building A, Room 117
Washington, D.C.  20001
porterj@dcodc.org