**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LARRY KLAYMAN

              Plaintiff,

v.

DISTRICT OF COLUMBIA COURT OF
APPEALS, et al

             Defendants.

**Case No.: 1:24-cv-02997**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
<u>DISMISS</u>**

## TABLE OF CONTENTS

INTROUCTION AND STATEMENT OF RELEVANT FACTS ...................................................1

    Facts Pertaining to Cliven Bundy's Trial.............................................................................3

    Facts Pertaining to the Bundy Matter ................................................................................5

    Facts Pertaining to the Defendants' First Amendment Viewpoint Discrimination ............7

LEGAL STANDARD...........................................................................................................11

THE LAW...........................................................................................................................12

    The Rooker-Feldman Doctrine Does Not Preclude This Matter ......................................15

    The Younger Abstention Doctrine Does Not Preclude This Matter..................................16

    The Individual Defendants Do Not Have Immunity Against Mr. Klayman's
    Claims For Damages, Which Go Far Beyond A Mere "Delay in Proceedings ................18

    Mr. Klayman Has More Than Sufficiently Pled Causes of Action ..................................24

        Mr. Klayman Has More Than Sufficiently Pled First Amendment Viewpoint
        Discrimination and Fifth Amendment Violation ...................................................25

        The Defendants Do Not Have Qualified Immunity...............................................28

CONCLUSION ...................................................................................................................29

## Table of Authorities

**STATUTES**

Board on Professional Responsibility Rule 12.2 ...........1, 2, 6, 7, 15, 19, 20, 22, 23, 25, 26, 28, 29

Fed. R. Civ. P. 65 .....................................................................................................................29

42 U.S.C. § 1983 ..........................................................................................................15, 16, 17, 23


**CASES**

*ABM Onsite Servs.-West, Inc. v. NLRB*, 428 U.S. App. D.C. 63 (2017) .......................................21

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...................................................................................28

*Ashcroft v. Iqbal*, 556 U.S. 662 (U.S. 2009.)....................................................................12, 25

*Associated Press v. Budowich*, 1:12-cv-00532 (D.D.C.) ................................................ 1, 11, 13 - 15

*Ariz. Grocery Co. v. Atchison, T. & S. F. R. Co.*, 284 U.S. 370 (1932) .......................................21

*Bridges v. Wixon*, 326 U.S. 135 (1945) ......................................................................................22

*Bridges v. Kelly*, 84 F.3d. 470 (1996). .......................................................................................16

*Cullen v. Fliegner*, 18 F.3d 96 (2d Cir. 1994). ...........................................................................18

*D.C. Healthcare Sys. v. District of Columbia*, 441 U.S. App. D.C. 126 (2019)....................15, 16

*Dep't of Revenue v. Race*, 743 So. 2d 169 (Fla. Dist. Ct. App. 1999))........................................ 21

*District of Columbia v. Jones*, 919 A.2d 604 (D.C. 2007) ........................................................ 19

*Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122
(D.C. Cir. 2023) ...............................................................................................1, 11, 12, 14, 15

*Gordon v. United States Capitol Police*, 778 F.3d 158 (D.C. Cir. 2015) .....................................12

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................................................................................28

*Hensler v. District Four Grievance Committee*, 790 F.2d 390 (5th Cir.1986).......................17, 18

*In re Cliven D. Bundy*, 16-72275 (9th Cir. Oct. 28, 2016) ..........................................................4, 5

*In re Green*, 136 A.3d 699 (D.C. 2016)........................................................................................24

*In re Morrell*, 684 A.2d 361 (D.C. 1996) ...............................................................................22, 23

*In re Thyden*, 877 A.2d 129 (D.C. 2005) ...............................................................................23, 24

*JMM Corp. v. District of Columbia*, 363 U.S. App. D.C. 160 (2004)..........................................17

*Johnson v. D.C. Dep't of Emp't Servs.*, 111 A.3d 9 (D.C. 2015) .................................................20

*Lewellen v. Raff*, 843 F.2d 1103 (8th Cir. 1988)........................................................................17

*Loper Bright Enterprises et al v. Raimondo, Secretary of Commerce, et al*, 22-451, (U.S. 2024)21

*Pearson v. Callahan*, 555 U.S. 223 (2009)..................................................................................28

*Parrish v. District of Columbia*, 718 A.2d 133 (D.C. 1989..............................................20

*Pulliam v. Allen*, 466 U.S. 522 (1984)......................................................................19

*Saucier v. Katz*, 533 U.S. 194  (2001) ......................................................................28

*Smith v. Scalia*, 44 F. Supp. 3d 28 (D.D.C. 2014) ...................................................19

*Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69  (2013)...........................................16

*United States v. Goldenberg*, 168 U.S. 95( 1897) ...................................................20

*Varela v. Hi-Lo Powered Stirrups, Inc.*, 424 A.2d 61 (D.C. 1980)........................20

*Wagshal v. Foster*, 307 U.S. App. D.C. 382, 28 F.3d 1249 (1994).............................19

Plaintiff Larry Klayman ("Plaintiff") hereby submits the following in response to Defendants Board on Professional Responsibility ("Board"), Sara Blumenthal, Margaret Cassidy, Thomas Gilbertsen, William Hindle, Sharon Rice-Hicks, Bernadette Sargeant, Leslie Spiegel, Michael E. Tigar, Robert Walker's (collectively " Board Defendants"), Robin Bell, Buffy Mims, Christian White's (collectively the "AHHC Defendants") Motion to Dismiss.

The Defendants predictably rely upon their familiar arguments of immunity and abstention, but in a case as egregious as this one—where the AHHC Defendants have egregiously violated Board on Professional Responsibility Rule 12.2 ("Rule 12.2") and the Board Defendants have then refused to enforce Rule 12.2, which rule was promulgated by Defendant District of Columbia Court of Appeals ("DCCA"), in a discriminatory manner—such arguments must fail. This is particularly true given that this is the exact type of discriminatory selective prosecutorial discriminatory treatment that the U.S. Court of Appeals for the District of Columbia Circuit has found to be unconstitutional and illegal in *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) ("*Douglass*") and which has been confirmed very recently on April 8, 2025 by the Honorable Trevor McFadden, an appointee of President Trump no less, in *Associated Press v. Budowich*, 1:12-cv-00532 (D.D.C.) ECF No. 46 ("*Associated Press*").

## <u>INTRODUCTION AND STATEMENT OF RELEVANT FACTS</u>

Mr. Klayman is a prominent conservative and Republican activist and attorney who engages in public speech furthering his conservative and Republican activist views and associates with other conservative and Republican activists and attorneys. Mr. Klayman brings in the public interest lawsuits furthering conservative and  true Republican ideals and engages in

public speech through his weekly radio show and other fora furthering his conservative and Republican ideals. Comp. ¶ 20.

The Board is appointed by Defendant DCCA and serves as its disciplinary arm, responsible for the adjudication of disciplinary cases and the administration of the attorney discipline system. The Ad Hoc Hearing Committee ("AHHC") preside over disciplinary hearings and are appointed by the Board. Comp. ¶ 5.

This is an extremely simple and straightforward case. The Board Defendants have refused to apply Board on Professional Responsibility Rule 12.2 ("Rules 12.2") - which rule was promulgated by the Defendant DCCA and assigned to Defendant Board to enforce – to dismiss an ongoing disciplinary action against Mr. Klayman (the "Bundy Matter"). Comp. ¶ 19. This is despite the fact that Rule 12.2 has been unequivocally and egregiously violated by the AHHC Defendants, who withheld their Report and Recommendation in the Bundy Matter for **over four (4) years**, hugely  past the required and mandated 120 days. Comp. ¶ 19. Because the Board refused to enforce Rule 12.2, Mr. Klayman was forced to sue the Board to seek injunctive relief in the form of an order requiring that Rule 12.2 be enforced (the "Bundy Litigation"), which would have mooted out the entire disciplinary proceeding. Mr. Klayman asked Defendant DCCA to either dismiss the disciplinary action on the basis of Rule 12.2 or to stay this disciplinary proceeding pending the outcome of the Bundy Litigation, but Defendant DCCA refused to do so, which necessitated this instant litigation.  Oral argument for the Bundy Matter is currently scheduled for May 28, 2025, and with the Defendant DCCA's judgment of April 17, 2025 affirming the erroneous dismissal by the Lower Court in Bundy Litigation, Mr. Klayman will suffer an irreparable injury and therefore necessitate, among other grounds,  the forthcoming

2

filing of his Motion for Temporary Restraining Order and/or Preliminary Injunction in this matter.

To make matters worse, the Board Defendants precipitously issued a Report and Recommendation while the Bundy Litigation was still pending, therefore creating the potential for a "temporary suspension" condition for Mr. Klayman, which in and of itself will cause him, his colleagues, his clients, and his family irreparable harm. In sum, the Defendants—persons and entities of D.C. Attorney Discipline Apparatus—as alleged herein are working together closely in concert to try to inflict as much harm as possible on Mr. Klayman to try to have him removed from the practice of law because he is a prominent conservative and Republican activist and attorney who they desire to silence contrary to his First Amendment rights. This is not speculation, but documented based on a pattern and practice of widely recognized "weaponized behavior" by the Defendants toward not just Mr. Klayman but also other prominent pro-Trump conservative and Republican activist attorneys.

## I.    Facts Pertaining to Cliven Bundy' Trial

In or around 2017, Mr. Klayman was retained by Cliven Bundy ("Mr. Bundy") to represent him in his criminal trial in the U.S. District Court for the District of Nevada ("Nevada Court") stemming from a 2016 standoff with federal agents on Mr. Bundy's land (the "Bundy Trial"). The stakes of the Bundy Trial were extremely high, as Mr. Bundy was facing the possibility of life imprisonment. Comp. ¶ 21. Presiding over the Bundy Trial was the Honorable Gloria Navarro ("Judge Navarro"). Comp. ¶ 22. Because Mr. Klayman was not a member of the Nevada Bar, he moved for admission *pro hac vice* in the Bundy Trial. Judge Navarro denied Mr. Klayman's motion, and Mr. Klayman appealed that decision to the U.S. Court of Appeals for the

Ninth Circuit ("Ninth Circuit"). Comp. ¶ 23. Ultimately, there were multiple appeals and motions filed by Mr. Klayman to try to gain entry as counsel into the Bundy Trial due to the fact that Mr. Klayman was trying to zealously represent his client, Mr. Bundy. Mr. Klayman and Mr. Bundy saw that there was an enormous amount of prosecutorial misconduct going on in the Bundy Trial, which caused Mr. Klayman to push even harder to get into the case in order to zealously defend Mr. Bundy's rights within the bounds of ethics and the law. Comp. ¶ 24. Mr. Klayman and Mr. Bundy's suspicions were more than confirmed when ultimately in January of 2018, Judge Navarro dismissed the charges against Mr. Bundy with prejudice as a result of gross prosecutorial misconduct in failing to turn over exculpatory documents and lying to the Court. Mr. Klayman never was able to gain admission into the Bundy Trial. Comp. ¶ 25.

Despite Mr. Klayman having never been sanctioned by the Nevada Court or the Ninth Circuit, any judge or other entity, for his efforts to gain admission into the Bundy Trial, the District of Columbia Office of Disciplinary Counsel ("ODC") still initiated a disciplinary complaint against Mr. Klayman for simply trying to represent his client in a life-or death criminal trial, alleging among other entirely frivolous and manufactured, contrived allegations, that Mr. Klayman had been dishonest and that his repeated attempts to gain *pro hac vice* admission into the Bundy Trial were somehow unethical. Comp. ¶ 26. This was despite the fact that the Honorable Ronald Gould ("Judge Gould") of the Ninth Circuit, who was a part of the panel overseeing the appeals at issue, made factual findings that Mr. Klayman had fulfilled his duty of candor:

> Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate…. I agree with Klayman that he was not

obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, **and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests.** *In re: Cliven D. Bundy*, 16-72275 (9th Cir. Oct. 28, 2016). Comp. ¶ 27.

## II.    Facts Pertaining to the Bundy Matter

Despite Judge Gould's clear findings, which negated any claim of clear and convinving evidence of an ethical infraction,  Mr. Klayman was summoned before the AHHC comprised of Defendants Mims, Bell, and White in July of 2019 and September of 2019 for disciplinary proceedings initiated by ODC for his efforts to gain entry into the Bundy Trial *pro hac vice*. Comp. ¶ 44.   At this hearing Mr. Klayman  had Professor Erwin Chemerinsky ("Dean Chemerinsky") of the University of California at Berkeley's Boalt Hall testify pro bono on his behalf. Dean Chemerinsky testified that he did not believe that Mr. Klayman did anything unethical and that Mr. Klayman's actions were reasonable. Comp. ¶ 45. To the contrary, ODC did not have a single witness, and instead had its incredibly conflicted prosecutor, Julia Porter ("Porter") serving as both prosecutor and witness. Comp. ¶ 46. It is therefore no surprise that at the conclusion of first three-day hearing before the AHHC on July 18, 2019, when the facts and evidence were fresh in the committee members' minds,  the chairperson, Defendant Mims stated on the record that "the Hearing Committee has been unable to reach a non-binding determination." Comp. ¶ 47. This finding, coming at this preliminary stage, is rare and unique, as hearing committee usually provisionally issues non-binding rulings which then permit them to take evidence on factors involving mitigation and/or aggravation. This was memorialized in the AHHC's August 8, 2019 order which stated:

5

Following the conclusion of the evidentiary portion of the hearing and the parties' respective closing arguments, the Hearing Committee went into executive session and determined that it could not make a preliminary finding that Disciplinary Counsel had proven any disciplinary rule violation. *Id*.

Then, for over four (4) years – almost an egregious and unbelievable almost half a decade - the AHHC went silent, leaving Mr. Klayman to very reasonably to rightly conclude that this matter had been laid to rest and thus disposed of, given the AHHC's finding after the hearing that ODC had failed to prove any ethical violations as well as because of Board Rule 12.2 ("Rule 12.2), which was promulgated by Defendant DCCA:

> The Hearing Committee's report shall be filed with the Board **not later than 120 days following the conclusion of the hearing.** The 120 days provided for by the Court's rules for the preparation of the Hearing Committee's report shall start to run at the conclusion of the hearing. Comp. ¶ 48.

Yet, on September 20, 2023 – over four (4) years after the AHHC Hearing concluded - nearly half of a decade later -  the AHHC incredibly without factual, legal and other bases reversed course 180 degrees and issued an AHHC Report and instead recommended a one-year suspension with a reinstatement provision. Comp. ¶ 49.

It more than appears that given this egregious and violative passage of time, the Defendants Mims, Bell, and White appear to have simply intentionally forgotten or simply ignored, during this highly partisan divisive period in history during the reemergence of Donald Trump in particular who Mr. Klayman supports, everything that occurred at the hearing back in 2019 and thus made the decision to simply "rubber stamp" what was presented to them back in 2019 by ODC. This is improper for a litany of reasons, none more compelling than the fact that ODC and Porter already made all of their same arguments at the 2019 AHHC hearing and were found to have failed to have proven any ethical violation. Absolutely nothing new was put into

the record in the interim over four (4) year period of delay. Thus, the only explanation for the AHHC reversing course nearly half of a decade later is that they simply copied and adopted wholesale the briefs of Porter and ODC from 2019 given that the four (4) year delay has caused them to either forget everything that happened at the AHHC hearing, or simply wanted to harm Mr. Klayman, his family and his colleagues given his support of Donald Trump, who was at that time running for President again in the 2024 presidential election. Comp. ¶ 51.

When Mr. Klayman brought the egregious violation of Rule 12.2 to the Board's attention, the Board and the Board Defendants incredibly refused to enforce Rule 12.2 with regard to Mr. Klayman. This led to the Bundy Litigation where Mr. Klayman sought injunctive relief in the form of an order directing the Board to enforce Rule 12.2, which the Defendant DCCA unsurprisingly refused to act upon. Mr. Klayman also asked the Defendant DCCA to stay the Bundy Matter pending the Bundy Litigation, as the Bundy Litigation would moot out the Bundy Matter, but the Defendant DCCA refused to even grant this stay, which would be in the interests of judicial economy and fundamental fairness and justice, particularly since Mr. Klayman's financial resources will be  even more severely taxed by having to defend a time-barred and non-meritorious disciplinary proceeding now scheduled for oral argument on May 28, 2025. This refusal to stay the Bundy Matter regrettably necessitated this instant litigation.

III. **Facts Pertaining to the Defendants' First Amendment Viewpoint Discrimination**

The bizarre  and unprecedented events of the Bundy Matter can only be explained by the highly politicized and partisan environment in the District of Columbia and its attorney discipline apparatus, which is reflected an attorney discipline apparatus that has disparately and selectively targeted attorneys who are conservative and Republican activists for removal from

7

the practice of law. The fact that Mr. Klayman and numerous prominent Republican and conservative activist attorneys have become targeted for legal removal in the District of Columbia has even been observed by Harvard law professor emeritus Alan Dershowitz's latest book, "Get Trump," which compared the state of affairs to the "kind of ridicule that suspected communists faced during the era of Sen. Joe McCarthy in the 1950s." Comp. ¶ 30. This is underscored by the fact that during the Trump years in particular, ethics complaints were filed, accepted and initiated against Trump White House Counsellor Kellyanne Conway[1] over remarks she made on cable news, against former Trump Attorney General William Barr[2] (the complaint was outrageously and incredibly filed by all prior presidents of the District of Columbia Bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[3] and Josh Hawley[4] over their role in advocating for President Trump in the last presidential election, Professor John Eastman[5] who served as a legal counsel for President Trump, and of course former U.S. Attorney Rudy Giuliani[6] over his representation of President Trump, to name just a few. Indeed, Giuliani was

---

[1]    https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[2]    https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

[3]    https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[4]    https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

[5]    https://www.reuters.com/legal/ex-top-justice-dept-officials-testimony-sought-ethics-hearing-trump-ally-clark-2022-10-06/

[6]    https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

just recently disbarred by the Bar over his association with and legal representation of President Trump. Comp. ¶ 33. And, perhaps the most telling of this discriminatory mindset is the fact that Bar Disciplinary Counsel Hamilton Fox III ("Fox") has personally gone after other Trump affiliated Republican legal counsel, such as Jeffrey Clark and Rudy Giuliani, often gloating to the media about his personal involvement. This is incredibly telling because it is almost unheard of for Bar Disciplinary Counsel to personally handle, try and litigate cases himself and not delegate them to his Deputy or Assistant Bar Disciplinary Counsel, so the fact that he chose to personally take on these matters shows conclusively what Fox's motivation is about, since it is nearly unheard of for Bar Disciplinary Counsel to take on and litigate these matters himself. With regard to Jeffrey Clark, the DCCA had step in and stop Fox and ODC's attempts to strip away Mr. Clark's constitutional Fifth Amendment rights, and Fox responded by saying "I'm not going to push that hearing back unless somebody cuts off one of my arms." Comp. ¶ 32.[7]

On the other hand, when a complaint was filed against leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary

---

[7] Mr. Klayman's assertion is not just based on their actions, but also on publicly available Federal Election Commission FEC donation records, among many other indicia, which reflect that Mr. Hora has donated to the Democratic National Committee, Biden Fight Fund, Actblue. Even more, the chairperson of the Board, Ms. Bernadette Sargeant has made donations to Hillary Clinton for President and Glen Ivey for Congress. Mr. William Hindle also has donated to ActBlue as well. Mr. Thomas E. Gilbertsen donated to Glenn Ivey for Congress. Mr. Robert Walker (has donated extensively to ActBlue.  Ms. Sara Blumenthal has donated to ActBlue. These are all highly partisan, Democrat leftist organizations and political candidates, many of which Mr. Klayman has sued in his public interest legal practice, including ActBlue, which is now under investigation for unlawful conduct. https://www.whitehouse.gov/presidential-actions/2025/04/investigation-into-unlawful-straw-donor-and-foreign-contributions-in-american-elections/

Notably not a single Defendant has donated money to any conservative politicians or organizations.

Clinton's 33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by former Justice Department lawyer and conservative lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well. Comp. ¶ 35. Furthermore, Kevin Clinesmith, the former senior FBI lawyer and admittedly anti-Trump partisan who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC and only temporarily suspended for only <u>five months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. Comp. ¶ 36. In stark contrast, the Michigan Bar automatically suspended Clinesmith immediately upon his felony conviction, and then ordered a suspension period of two (2) years. *Id*. And lastly, as set forth in the Complaint, is reference is a report written by Paul Sperry titled "Trump's Toughest Foe Could Be Harris Lawyer Marc Elias" (the "Elias Article"). The Elias Article details how Marc Elias' ("Elias") efforts to use the court system to prevent Donald Trump from being elected president. The Elias Article details in pertinent part:

> The longtime Democratic Party lawyer has already filed more than 60 preelection lawsuits to stop Trump from becoming president again by combatting what he calls Republican "voter suppression" efforts such as requiring voters to provide identification at the polls.
>
> …
>
> At the same time, Elias has been sending letters to election officials in Georgia and other key swing states threatening legal action if they uphold challenges to voter rolls to remove noncitizens and other ineligible registrants.
>
> …

> As general counsel to Hillary Clinton's 2016 presidential campaign, he helped
> lead the effort to manufacture and leak spurious "opposition research" claiming to
> reveal illicit ties between Trump and Russia. Elias later testified that he was
> worried – then as now – that Trump was a threat to democracy: "I received
> information that was troubling as someone who cares about democracy." That
> "information" turned out to be a fictitious "dossier" linking Trump to the Kremlin
> crafted by former British spook and FBI informant Christopher Steele, who
> huddled with Elias in his Washington office.
>
> …
>
> But Elias has since taken on other clients – including Kamala Harris – who have
> more than made up for the loss in revenue. So far in this election cycle, the latest
> FEC filings show the Elias Law Group has received a total of more than $22
> million in disbursements from a host of major Democratic and anti-Trump clients.

Elias' efforts with regard to the 2016 election, "[s]pecial Counsel John Durham found Elias

intentionally sought to conceal Clinton's role in the dossier. According to court records, Elias

acted as a cutout for more than $1 million in campaign payments for the dossier." As the Elias

Article set forth, the Durham probe as disclosed by Paul Sperry "**<u>raised ethical issues with the

D.C. Bar</u>** and Elias' former law firm, Perkins Coie, reportedly leading to their breakup in August

2021…." Given that Elias was never disciplined by the D.C. bar, the only conclusion is that this

was also covered up and buried by the D.C. attorney discipline apparatus. Comp. ¶¶ 38 – 39.

As set forth herein below, this is the exact type of selective prosecutorial discriminatory

treatment that the U.S. Court of Appeals for the District of Columbia Circuit has found to be

unconstitutional and illegal *Douglass* and which Judge McFadden recently confirmed in

*Associated Press*.

## <u>LEGAL STANDARD</u>

Fed. R. Civ. P. 8(a)(2) states that a pleading need only include "a short and plain

statement of the claim showing that the pleader is entitled to relief." When reviewing a Fed. R.

Civ. P. 12(b)(6) motion to dismiss, the court must "accept the complaint's allegations as true and draw all reasonable inferences in favor of the non-moving party*." Gordon v. United States Capitol Police*, 778 F.3d 158, 163-164 (D.C. Cir. 2015).

A complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. (internal quotations omitted). As such, a motion to dismiss at this stage must be decided solely on what Mr. Klayman has plead in his complaint, taken as true.

## THE LAW

This case is being brought pursuant to ground-breaking precedential case law from the D.C. Circuit in *Douglass*. *Douglass* involved the Frederick Douglass Foundation ("Foundation"), a pro-life foundation, which had its advocates arrested for writing with chalk "Black Pre-Born Lives Matter." *Id*. at 1131. The Foundation sued the District of Columbia, alleging among other causes of action, First Amendment free speech selective enforcement. As evidence of disparate treatment, the Foundation pointed to the fact that in the summer of 2020, "thousands of protesters flooded the streets of the District to proclaim 'Black Lives Matter.' Over several weeks, the protesters covered streets, sidewalks, and storefronts with paint and chalk. The markings were ubiquitous and in open violation of the District's defacement ordinance, yet none of the protesters were arrested." *Id*.  The D.C. Circuit found that both the Foundation and the BLM protestors were similarly situated and that the Foundation had adequately alleged that the District of Columbia had engaged in viewpoint selective prosecutorial discrimination in violation of the First Amendment:

In particular, the District permitted individuals expressing the "Black Lives Matter" message to violate the defacement ordinance, as evidenced by the widespread painting, graffiti, and other defacement on public sidewalks, streets, and buildings, and on private property. By making no arrests, the police effectively exempted advocates of the "Black Lives Matter" message from the requirements of the ordinance. In contrast, the police showed up in force to the Foundation's small rally and arrested individuals who chalked "Black Pre-Born Lives Matter" on the sidewalk. *Id*. at 1142.

The D.C. Circuit reasoned and ruled: "It is fundamental to our free speech rights that the government cannot pick and choose between speakers, not when regulating and not when enforcing the laws." *Id*. at 1141. "[T]he government has no authority to license one side to fight freestyle, while forbidding the other to fight at all." *Id.* at 1142. "The government may not enforce the laws in a manner that picks winners and losers in public debates. It would undermine the First Amendment's protections for free speech if the government could enact a content-neutral law and then discriminate against disfavored viewpoints under the cover of prosecutorial discretion." *Id*. at 1142.

This was  recently confirmed and followed by Judge McFadden in *Associated Press*. *Associated Press* refers to Judge McFadden's memorandum opinion granting a motion for preliminary injunction filed by the Associated Press ("AP") against the Trump administration for First Amendment viewpoint discrimination. Judge McFadden unequivocally held, "if the Government opens its doors to some journalists—be it to the Oval Office, the East Room, or elsewhere—it cannot then shut those doors to other journalists because of their viewpoints. **The Constitution requires no less**." *Associated Press* at 2. In *Associated Press*, the AP moved for preliminary injunction relief on the grounds that they had been excluded from both the press pool and larger pre-credentialed media events at the White House after refusing to comply with the

13

Trump administration's changing of the name of the Gulf of Mexico to the Gulf of America. *Associated Press* at 1. At the evidentiary hearing, the AP was able to show through unrefuted testimony and evidence that "the AP's witnesses made clear that its text reporters have been systematically and almost completely excluded from events open to the broader White House press corps since February 13, while its photographers have suffered curtailed access." *Associated Press* at 9. Furthermore the Trump administration "conceded that the record reveals viewpoint-discriminatory motives, so all indicators point to retaliation.." *Associated Press* at 33. Under these circumstances and facts, Judge McFadden found that "AP has shown that it is likely to succeed on the merits of its First Amendment and retaliation claims, both for its exclusion from eligibility for press pool and limited-access events." *Associated Press* at 36. Judge McFadden therefore ordered that the Trump administration "put the AP on an equal playing field as similarly situated outlets, despite the AP's use of disfavored terminology" and declared that "the AP's exclusion has been contrary to the First Amendment and it enjoins the Government from continuing down that unlawful path." *Associated Press* at 40 – 41.

It is clear to see how *Douglass* and *Associated Press* both apply to this instant case. Conservative and Republican activist public interest and other attorneys have been prosecuted and targeted the Defendants—to the extent that they would willfully ignore the rules which were promulgated by Defendant DCCA—while convicted felons such as Clinesmith who has committed egregious ethics violations involving dishonesty are barely given a "slap on the wrist" simply because they were Democrats adverse to Trump and employed as counsel the insider influential former Chairman of the Board Eric Yaffe – consistent with the overarching goal of silencing and abridging the First Amendment rights of activist conservative and Republican

14

attorneys, such as Mr. Klayman. Other Democrat attorney such as David Kendall and Marc Elais have their egregious misconduct completely ignored. The only difference between who gets punished and who gets ignored is their First Amendment political viewpoints and beliefs. This is illegal, unconstitutional and improper under both *Douglass* and *Associated Press*, and none of the Defendants' arguments to the contrary can change this fact.

**I.      The *Rooker-Feldman* Doctrine Does Not Preclude This Matter**

Defendants attempt to argue that the District of Columbia Superior Court' dismissal of the Bundy Litigation bars Mr. Klayman from seeking relief for a violation of his First Amendment rights under the *Rooker Feldman* doctrine. This argument has zero merit.

"The Supreme Court has explained that the purpose of the *Rooker-Feldman* doctrine is to effectuate 28 U.S.C. § 1257, which "'vests authority to review a state court's judgment solely in [the Supreme] Court.'" *D.C. Healthcare Sys. v. District of Columbia*, 441 U.S. App. D.C. 126, 131 (2019). "The Supreme Court has repeatedly described the *Rooker-Feldman* doctrine as a 'narrow one." *Id.* "Indeed, the Court has found it applicable only twice." *Id.* Importantly, "if "a federal plaintiff present[s] [an] *independent* claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court." *Id.* at 132 (emphasis in original).

The Bundy Litigation was a state court action that solely sought injunctive relief and declaratory relief that the Board must enforce Rule 12.2. This instant matter brings claims under 42 U.S.C. § 1983 for violations of Mr. Klayman's First and Fifth Amendment rights, and seeks damages from the Defendants in that regard in addition to seeking injunctive and equitable relief. These claims could not be more different and this instant matter clearly presents the Court with

an "independent claim" that falls outside of the Bundy Litigation. *D.C. Healthcare Sys*, 441 U.S. App. D.C. at 131. Thus, particularly given the extremely narrow application of the *Rooker-Feldman* doctrine, *id*., it is clear that the *Rooker-Feldman* doctrine does not preclude this instant action.

## II.    The *Younger* Abstention Doctrine Does Not Preclude This Matter

Defendants next present an equally meritless argument that this matter is precluded by the *Younger* abstention doctrine. "In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). Circumstances fitting within the *Younger* doctrine, we have stressed, are "exceptional"; they include… "state criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id*. Given the very limited nature of this doctrine, it is clear that Courts should not strain to find that it is applicable.

*Bridges v. Kelly*, 84 F.3d. 470 (1996) shows exactly how and why the *Younger* abstention doctrine does not apply to this case. In *Bridges*, the Plaintiff brought federal suit under, among other counts, 42 U.S.C. § 1983 after an alleged wrongful termination from his position as attorney-advisor in the District of Columbia's Department of Administrative Services. *Id*. at 471. Prior to filing suit, the Plaintiff had exercised his right of appeal of his termination to the Office of Employee Appeals—an administrative appeal. *Id*. On the grounds that the administrative appeal was still pending, the lower court in *Bridges* exercised the *Younger* abstention doctrine with regard to Plaintiff's federal lawsuit. The U.S. Court of Appeals for the District of Columbia

16

Circuit ("D.C. Circuit") reversed on the grounds that "appellant could not receive from the D.C. system the full panoply of remedies available to him from the District Court in connection with his federal claims." *Id*. Specifically, the D.C. Circuit reasoned that the fact that Plaintiff had sought millions in damages in the federal suit rendered *Younger* clearly inapplicable because "[w]e find nothing in the D.C. Code, and appellees cite nothing, authorizing the OEA to grant relief such as punitive damages and compensatory damages (in excess of back pay and benefits) for harms flowing from tortious conduct." *Id*. at 477. The exact same situation is present here. Mr. Klayman has also sought damages under 42 U.S.C. § 1983. Even if the District of Columbia Superior Court ultimately dismisses the Bundy Matter or finds that no discipline is warranted, it certainly cannot grant damages. Thus, *Younger* is inapplicable here as well.

Furthermore, it is indisputable that there exists a "bad-faith" exception to the *Younger* doctrine, which this Court has defined as "where 'the pending state action was brought in bad faith or for the purpose of harassing' the federal plaintiff...." *JMM Corp. v. District of Columbia*, 363 U.S. App. D.C. 160, 170 (2004). Furthermore, other courts have found:

> A showing that a prosecution was brought in retaliation for or to discourage the exercise of constitutional rights "will justify an injunction regardless of whether valid convictions conceivably could be obtained." *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir.1981). The state does not have any legitimate interest in pursuing such a prosecution; "[p]erhaps the most important comity rationale of Younger deference—that of respect for the State's legitimate pursuit of its substantive interests—is therefore inapplicable." *Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir.1979).

*Lewellen v. Raff*, 843 F.2d 1103, 1109–10 (8th Cir. 1988). "When, however, a state bar acts in bad faith or to retaliate against First Amendment protected activity, the courts should not abstain." *Hensler v. District Four Grievance Committee*, 790 F.2d 390, 391 (5th Cir.1986).

17

"Abstention would serve no purpose because a state cannot have a legitimate interest in discouraging the exercise of constitutional rights, or, equally, in continuing actions otherwise brought in bad faith, thereby reducing the need for deference to state proceedings." *Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994).

**The egregious four year delay constitutes prima facie bad faith, particularly given that the Complaint has detailed how this delay constitutes the illegal practice of "stacking" disciplinary proceedings. Comp. ¶ 53. Specifically, the Bundy Matter has been used to "stack" disciplinary proceedings against Mr. Klayman to ensure that he remains ineligible to practice law in the District of Columbia given that he had only recently on August 6, 2024 petitioned for reinstatement to practice following the conclusion of the suspension period in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"). Stacking has been ruled unethical and illegal by state bars. *Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978).**

Thus, assuming *arguendo* that *Younger* could apply, it is clear that the bad faith exception would apply. This is because Mr. Klayman has clearly alleged retaliation against First Amendment protected activity. *Hensler* 790 F.2d at 391. Thus, "[a]bstention would serve no purpose because a state cannot have a legitimate interest in discouraging the exercise of constitutional rights, or, equally, in continuing actions otherwise brought in bad faith, thereby reducing the need for deference to state proceedings." *Cullen* 18 F.3d at 104.

## III. The Individual Defendants Do Not Have Immunity Against Mr. Klayman's Claims For Damages, Which Go Far Beyond A Mere "Delay in Proceedings"

The Individual Defendants next attempt to advance the argument that they are somehow immune from Mr. Klayman's claims for damages. Notably, they do no attempt to argue that such

immunity applies to Mr. Klayman's claims for injunctive relief, nor could they under well-established precedent in *Pulliam v. Allen*, 466 U.S. 522, 536-543 (1984), *Wagshal v. Foster*, , 28 F.3d 1249, 1251 (1994) and *Smith v. Scalia*, 44 F. Supp. 3d 28, 43 (D.D.C. 2014). Unfortunately for the Defendants, however, their assertion of "absolute immunity" against Mr. Klayman's damages claims also fails.

"In the District of Columbia, the standard for conferring absolute immunity is set forth in *Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990). Absolute immunity applies when conduct is (1) within the "outer perimeter" of official duties, and (2) the governmental function at issue was "discretionary" rather than "ministerial." *District of Columbia v. Jones*, 919 A.2d 604, 608 (D.C. 2007)." A review of the allegations of the Complaint show exactly why the Defendants' assertions of "absolute immunity" must fail. This case involves the AHHC Defendants' flagrant violation of Rule 12.2 and the Board Defendants' refusal to enforce Rule 12.2. Rule 12.2 clearly states:

> The Hearing Committee's report shall be filed with the Board **not later than 120 days following the conclusion of the hearing.** The 120 days provided for by the Court's rules for the preparation of the Hearing Committee's report shall start to run at the conclusion of the hearing. Comp. ¶ 48.

Defendants attempt to *ex post facto* inject "discretion" into Rule 12.2 and disingenuously and dishonestly mischaracterize their conduct as merely a "delay in proceedings," but the language of the rule as well as established case law make it clear that these assertions are meritless.

*First*, the plain language of Rule 12.2 is unequivocal. There is not even an inkling of so-called "discretion" written into the plain language of Rule 12.2. This can be gleaned and confirmed from the language of the rule itself, which uses to word "shall" and not some other

word with more flexibility built in, such as "may." Under these circumstances, the plain language of the rule must be enforced. *Johnson v. D.C. Dep't of Emp't Servs.*, 111 A.3d 9 (D.C. 2015). ("…we begin with an examination of the plain language of the statute, *Parrish v. District of Columbia*, 718 A.2d 133, 136 (D.C. 1989), which we assume best reflects the intent of the legislature. *Varela v. Hi-Lo Powered Stirrups, Inc*., 424 A.2d 61, 64-65 (D.C. 1980)." *Id*. at 9-10. "If the meaning of the statute is plain on its face, resort to legislative history or other extrinsic aids to assist in its interpretation is not necessary." *Id.*

> The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language  that he has used. He is presumed to know the meaning of words and the rules of grammar. The courts have no function of legislation, and simply seek to ascertain the will of the legislator. It is true there are cases in which the letter of the statute is not deemed controlling, but the cases are few and exceptional, and only arise when there are cogent reasons for believing that the letter does not fully and accurately disclose the intent. No mere omission, no mere failure to provide for contingencies, which it may seem wise to have specifically provided for, justify any judicial addition to the language of the statute. *United States v. Goldenberg*, 168 U.S. 95, 102-03, 18 S. Ct. 3, 4 (1897)

Crucially, this exact situation has already been decided by this Court. "In this case there is no ambiguity at all in the statutory language, which clearly states that the applicable assessments "shall" be imposed. **It is well established that the word "shall" is "a term which creates a duty, not an option**." *Parrish v. District of Columbia*, 718 A.2d 133, 136 (D.C. 1998) (emphasis added).  Rule 12.2 says "shall," not "may." This creates a duty, not a discretionary option, as already found by the D.C. Court of Appeals. This Court holding otherwise would create a conflict of law with established precedent.

*Second*, there is a litany of well-established case law, including from the Supreme Court, that that an agency (such as the Board and AHHC) must comply with rules promulgated and

legislated by the higher authority (sch as the DCCA) and does not have "discretion" to ignore these rules at its own whim. This fundamental principle was confirmed by the Supreme Court in June of this year in *Loper Bright Enterprises et al v. Raimondo, Secretary of Commerce, et al*, 22-451, (U.S. 2024), which held by way of analogy, that the Administrative Procedure Act "requires courts to 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law.'"

Furthermore, the U.S Court of Appeals for the District of Columbia Circuit has found that there is a "fundamental principle that an agency may not act in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *ABM Onsite Servs.-West, Inc. v. NLRB*, 428 U.S. App. D.C. 63, 68 (2017). "It is well-settled that… any…agency— cannot 'turn[] its back on its own precedent and policy without reasoned explanation.'" *Id.* at 72. "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* Furthermore, "It is well established that an agency may not ignore its own rules." *Dep't of Revenue v. Race*, 743 So. 2d 169, 171 (Fla. Dist. Ct. App. 1999).

This fundamental, black letter, well-settled principle has been found to be true by the Supreme Court in *Ariz. Grocery Co. v. Atchison, T. & S. F. R. Co.*, 284 U.S. 370 (1932) for nearly one century now. In *Ariz. Grocery*, the Supreme Court was tasked with deciding "the power of the Interstate Commerce Commission to award reparations with respect to shipments which moved under rates approved or prescribed by it." *Id.* at 381. In other words, the ICC, which had been granted authority to set maximum and minimum rates for public carriers, lowered the maximum rate and found that reparations were due shippers that had paid the higher

rate. The Supreme Court stepped in and found that the ICC did not have the ability to ignore its own rules and previously published rates:

> Where the Commission has, upon complaint and after hearing, declared what is the maximum reasonable rate to be charged by a carrier, it may not at a later time, and upon the same or additional evidence as to the fact situation existing when its previous order was promulgated, by declaring its own finding as to reasonableness erroneous, subject a carrier which conformed thereto to the payment of reparation measured by what the Commission now holds it should have decided in the earlier proceeding to be a reasonable rates. *Id*. at 390.

This is analogous to here, where the subject rule was promulgated by this Court, a higher controlling authority.

Then, in *Bridges v. Wixon*, 326 U.S. 135 (1945), the Supreme Court "doubled down" on this fundamental principle in a case involving the deportation proceedings of an alien who was alleged to have been affiliated with the Communist Party. The Supreme Court found that the INS did not have authority to ignore its own promulgated rules and introduce "evidence" outside of what was allowable under its own rules to try to prove the alien's alleged Communist affiliation and membership. The Supreme Court held, "[t]he rules are designed to protect the interests of the alien and to afford him due process of law." *Id*. at 152.

On the other hand, the one case that Defendants rely upon to claim "discretion," *In re Morrell*, 684 A.2d 361 (D.C. 1996) is completely inapplicable. Indeed, even if *Morrell*'s "discretion" was valid—which it clearly is not—such alleged "discretion" cannot be used to justify an unprecedented huge **four-year** delay. This is flat-out wrong.

*Morrell* is a case from 1996 where the time limit for the AHHC to issue its Report was governed by the D.C. Bar Rules and not Rule 12.2 as is the case here. *Id*. at 370. In *Morrell*, the AHHC only missed the deadline by approximately four (4) <u>months</u>, not four (4) <u>years – nearly</u>

<u>half a decade --</u> as is the case here. Furthermore, *Morrell* involved an incredibly complex case involving the attorney's representation of a corporation between 1983 and 1990 and misappropriation of client funds involving multiple firms and different corporate entities. Only under these analogous facts, this Court held:

> Although the record was complete as of January 5, 1995, the Hearing Committee did not submit its report and recommendations until July 26, 1995, substantially after the sixty-day time frame envisioned by the Bar Rules. Nothing in the text of the rules, however, specifies the result of a Hearing Committee's failure to adhere to the time limit, so **we presume** that the rule is directory, rather than mandatory… It would hardly serve the integrity of the bar, moreover, to allow Morrell to avoid the imposition of discipline for his serious ethical violations merely because the Hearing Committee took a long time carefully evaluating the substantial, complex evidence in his case." *Id.*

Thus, *Morrell* is entirely distinguishable and inapposite on numerous grounds. *First*, *Morrell* involved a different set of rules. *Second*, the length of delay was four (4) months, versus an unconscionable and egregious four (4) years here. *Third*, *Morrell* was incredibly complex, which the Court used to justify the brief four-month delay, in contrast to here, where ODC did not call a single witness. *Fourth*, in *Morrell* the Court was not tasked with interpreting Rule 12.2 as it is here. *Fifth*, under the incredibly distinct facts of *Morrell*, this Court only half-heartedly "presumed," that the time limit was discretionary – hardly language that constitutes a definitive finding of precedent.

None of the other cases cited by the Defendants are analogous either. *In re Thyden*, 877 A.2d 129 (D.C. 2005) also did not invoke Rule 12.2, and like *Morrell*, was governed by the D.C. Bar Rules. The delay in *Thyden* was only approximately two (2) years, half of the egregious **four year delay** at issue here. And, the attorney in *Thyden* did not show prejudice resulting from the delay. Here, Mr. Klayman more than showed the prejudice given the fact that at the conclusion

of the AHHC hearing in 2019, the AHHC found that ODC had failed to prove any disciplinary violation, but then reversed course **four years later** after their recollection of the events had clearly diminished.

*In re Gree*n, 136 A.3d 699 (D.C. 2016) does not even specify the amount of delay that the attorney suffered, so it cannot be used as a point of comparison to this case. Furthermore, in *Green*, the attorney did not even address his delay in earnest, as it was only brought up in his "motion to the Board for extra time to file exceptions" and "never identified any prejudice in his motion to the Board…." *Id.* at 700. On the other hand, Mr. Klayman has suffered a clear **four year delay** and clearly identified the severe prejudice which has resulted.

Thus, the bottom line is that there is simply no "discretion" involved here. Without "discretion," there can be no absolute immunity. This far more than a mere "delay in proceedings[8]." Defendants' predictably disingenuous attempts to minimize the severe harm cause by the egregious **four year delay** must be swiftly rejected by the Court. Not only does the well-established case law demand this, so do the essential notions of fairness and justice.

**IV.    Mr. Klayman Has More Than Sufficiently Pled Causes of Action**

---

[8] Defendants' attempt to argue that the egregious delay in proceedings suffered by Mr. Klayman in another disciplinary matter, *In re Klayman*, 282 A.3d 584, 591 (D.C. 2022) (the "Sataki Matter"), serves to preclude his arguments here. This is an intentional mischaracterization of the facts. In the Sataki Matter, Mr. Klayman suffered a seven (7) year delay from between when the complainant filed a bar complaint against him to when ODC filed their specification of charges. The District of Columbia claims not  have a statute of limitations for situations like this, and thus under these circumstances the doctrine of laches would apply. On the other hand, the delay here was by the AHHC in issuing is Report. The Board Rules expressly address this delay in Rule 12.2. These situations are therefore not even remotely comparable and it is frankly intellectually dishonest for counsel to Defendants to argue such.

Finally, the Defendants turn to the meritless argument that Mr. Klayman has failed to sufficiently allege causes of action in his Complaint. Defendants argue that Mr. Klayman has failed to plead that he was subjected to First Amendment viewpoint discrimination and that the Defendants enjoy qualified immunity. Neither of the assertions have any merit.

### a. Mr. Klayman Has More Than Sufficiently Pled First Amendment Viewpoint Discrimination and Fifth Amendment Violation

Defendants attempt to argue that Mr. Klayman's claims are insufficiently pled because (1) he did not plead facts to show that the Board interpreted Rule 12.2 differently from others similarly situated, (2) he did not plead facts showing he was singled out for enforcement among others similarly situated, and (3) he did not plead that his treatment was "motivated by invidious discrimination." As shown herein, none of these arguments have any merit.

*First*, Mr. Klayman did, in fact, plead that the Board interpreted Rule 12.2 differently from others similarly situated:

> On information and belief, and which will be borne out in discovery, the refusal to enforce Rule 12.2 to dismiss the Bundy Matter is due to Mr. Klayman's conservative and Republican activism, speech, association, and beliefs. On information and belief, there are many other examples of the Defendants selectively enforcing the Board Rules to the benefit of leftist and Democrat attorneys and to the detriment of conservative and Republican activist attorneys. Comp. ¶ 56.

At this initial motion to dismiss stage, prior to any discovery, it is clear that the Court must take Mr. Klayman's allegations as true. *Iqbal*, 556 U.S. at 678. The Defendants attempt to inject their own misleading facts here, claiming that the Board has regularly held that a violation of Rule 12.2 does not justify a dismissal as to a "variety of attorneys." Without any discovery, it is improper for the Court to take this factual interjection by the Defendants at face value. How do

the Defendants know the political beliefs of the attorneys who the Board allegedly refused to apply Rule 12.2 to? This can only be answered through the internal records from the Board, as well as deposition testimony of other instances where Rule 12.2 was allegedly ignored as well, along with information about the length of delay at involved. Thus, this is a purely factual question that can only be developed in discovery. At this stage, Mr. Klayman has more than sufficiently pled what he needs to

*Second*, should the Court take the inquiry further, it is clear that Mr. Klayman's allegations are far from conclusory, as he has pled and provided multiple examples of conservative attorneys being treated differently from democrat attorneys simply due to their political beliefs and ideology. Mr. Klayman has pled that David Kendall, Kevin Clinesmith, and Marc Elais—all prominent democrat attorneys—have had their egregious unethical misconduct ignored by the District of Columbia Attorney Discipline Apparatus, to which the Defendants all belong. Comp. ¶¶ 35 – 39. On the other hand, prominent conservative attorneys such as Trump White House Counsellor Kellyanne Conway, former Trump Attorney General William Barr, Senators Ted Cruz and Josh Hawley, Professor John Eastman who served as a legal counsel for President Trump, former U.S. Attorney Rudy Giuliani, and Trump-affiliated Republican legal counsel, Jeffrey Clark have all been targeted for elimination with Mr. Giuliani having recently been disbarred. Comp. ¶¶ 32- 33. Furthermore, Mr. Klayman has more than sufficiently alleged that his First Amendment right to freedom of speech and expression have been severely curtailed by the Defendants' conduct:

> The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys chills, deters, and restricts Mr. Klayman from

> participating in activities organized around his conservative and Republican activist views. Comp. ¶ 68.
>
> The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys impermissibly infringes on Mr. Klayman's right to associate on the basis of his conservative and Republican activist beliefs. Comp. ¶ 70.

At the motion to dismiss stage, this is more than sufficient. It logically follows that if Mr. Klayman's livelihood as an attorney and public interest advocate is being threatened by his public advocacy for conservative interests, his ability to speak freely and engage in such public conservative advocacy would be severely harmed. In sum, Mr. Klayman has clearly pled the pattern and practice of disparate, viewpoint-based discriminatory treatment that conservative and Republican activist attorneys have been subjected to by the Defendants, and at the motion to dismiss stage, more than sufficiently supports Mr. Klayman's causes of action.

*Third*, Mr. Klayman has more than sufficiently pled that the Defendants' actions were motivated by "invidious discrimination." Indeed, Porter ODC's motivation is no secret, as at the conclusion of the AHHC hearing in the Bundy Matter, Defendant Porter couldn't help but to blurt out that Mr. Klayman "should not continue to have the privilege of being a lawyer," evidencing that she was being driven by a personal animus and dislike for Mr. Klayman. Comp. ¶ 57. With regard to Jeffrey Clark, the DCCA had step in and stop Fox and ODC's attempts to strip away Mr. Clark's constitutional Fifth Amendment rights, and Fox responded by saying "I'm not going to push that hearing back unless somebody cuts off one of my arms." Comp. ¶ 32. These few quotes are evident of the mindset of not only ODC, but the District of Columbia Attorney Discipline Apparatus at large. The Defendants are clearly motivated by "invidious

discrimination," and indeed hatred and animus towards conservative attorneys such as Mr. Klayman.

### b.  The Defendants Do Not Have Qualified Immunity

Qualified immunity does not shield "the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Qualified immunity protects public officials from personal liability only if the alleged misconduct did not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). It is similar to a good faith defense, but focuses on objective reasonableness, not subject belief. *Id*. at 818. It balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether qualified immunity applies, a court looks to (1) whether a plaintiff's allegations, taken as true, show that the official's conduct violated a constitutional or statutory right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The Defendants have no real argument that qualified immunity applies. They take a disingenuous and intentionally deceptive and myopic view of Mr. Klayman's allegations and try to frame the "constitutional right" that was violated as the "interpretation of Rule 12.2." For the purposes of qualified immunity, this is not the "constitutional right" that is being violated. The constitutional rights that are being violated are Mr. Klayman's First and Fifth Amendment rights. Comp. ¶¶ 65 – 90. There is no possible debate that a person's First and Fifth Amendment

28

constitutional rights are not "clearly established." Thus, qualified immunity does not apply here.

<u>CONCLUSION</u>

Accordingly, the Defendants' motion to dismiss must be swiftly denied in its entirety. Put simply, there is simply no "discretion" for the Defendants to refuse to comply with and implement Rule 12.2, which their entire purpose is to enforce the Board Rules. Mr. Klayman has provided the Court with a litany of binding precedential authority that an agency such as the Board may not simply disregard this Court's rules, and that court intervention is proper where an agency, such as the Board, refuses to comply. Thus, there is simply no question of immunity invoked or raised, given that the only issue is the Defendants' refusal to comply with the rules which have been promulgated by the Court.

Mr. Klayman has already suffered severe harm as a result of the Defendants' actions, and this harm will not stop without timely intervention from the Court. This unconstitutional First Amendment viewpoint discrimination and vindictive and retaliatory conduct cannot be permitted to occur because Mr. Klayman does not share the same ideological and political beliefs as those in charge of the District of Columbia Attorney Discipline Apparatus. This is manifestly unjust and fundamentally wrong and must be seriously addressed and remedied by this Court.

Mr. Klayman respectfully requests that this matter be ruled upon expeditiously as this is an extremely time-sensitive issue. Mr. Klayman respectfully requests a decision within twenty (20) days of completion of briefing on the Defendants' motion to dismiss.

**In addition, Mr. Klayman will be filing shortly a motion for temporary restraining order and preliminary injunction under Fed. R. Civ. P. 65, as the harm to him is exponentially increasing based on recent events. This meritorious pleading will require this**

**Court to act quickly to prevent further harm to Mr. Klayman, as in the past in alleged related proceedings for which it was assigned, it respectfully has not ruled in a timely fashion, compounding the harm to Plaintiff.  Now is the time to further the interests of justice without delay**.[9]

Date: April 28, 2025                         Respectfully submitted,

                                             */s/ Larry Klayman*
                                             Larry Klayman
                                             Klayman Law Group P.A.
                                             7050 W. Palmetto Park Rd
                                             Boca Raton, FL, 33433
                                             Tel: (561)-558-5336
                                             Email: leklayman@gmail.com

                                             Plaintiff Pro Se


**CERTIFICATE OF SERVICE**

I, Larry Klayman, hereby certify that on this day, April 28, 2025  a copy of the foregoing was served counsel for all parties via the Court's ECF procedures.

                                             */s/ Larry Klayman*

---

[9] In *Klayman v. Porter et al*, 21-cv-3109 (D.D.C.), this Court failed to rule on time sensitive pending matters for over nine (9) months during the pendency of Mr. Klayman's suspension in the Sataki <atter, running off of the time clock for his eighteen (18) month suspension and rendering the case essentially moot, necessitating an appeal and motion for recusal or disqualification from this or further proceedings.  *Klayman v. Porter et al*, 23-7034 (D.C. Cir.).